Commonwealth *v.* Philip Hill, Appellant, James Hill and Earley Banks.

185  385
a196 416

*Appeals — Supersedeas — Execution — Criminal law—Murder — Act of May* 19, 1897.

Although appeals in criminal cases, including capital cases, are allowed as of right, as in civil cases, upon the oath of the prisoner that they are not for purposes of delay, yet they do not supersede execution issued, unless taken out within three weeks from sentence as provided by the Act of May 19, 1897, P. L. 67.

A mandate of the governor authorizing and requiring the sheriff to execute a sentence of death, is an " execution issued " within the meaning of the act of May 19, 1897, and is not superseded by an appeal taken more than three weeks after the sentence.

The origin of the custom of the governor issuing a mandate for execution in capital cases examined and considered. Form of mandate and return thereto.

Professional duties and obligations of counsel in criminal cases commented on.

*Criminal law—Murder—Sentence—Execution.*

The time of execution in a capital case is no part of the judgment, but a mere executive or ministerial act in pursuance of it, and the judgment is therefore not affected by the prisoner's escape, or other occurrence which merely prevents or delays execution. The judgment is not satisfied until the sentence is fully carried out.

VOL. CLXXXV—25

A prisoner was sentenced to death on July 31, 1897, and the governor issued a mandate fixing December 8, 1897, as the day of execution. On the morning of December 8, counsel for the prisoner entered an appeal in the office of the prothonotary of the Supreme Court, and the sheriff, being advised by counsel that the question of supersedeas under the act of May 19, 1897, was at least doubtful, postponed the execution. *Held,* (1) that the appeal did not act as a supersedeas; (2) that the sheriff in failing to execute the warrant on the day named was technically liable as for an escape; (3) that it was the duty of the sheriff after the affirmance of the judgment by the Supreme Court, without any undue delay, and without further action by the court or the governor, to proceed to execute the sentence.

Argued Jan. 10, 1898. Appeal, No. 35, Oct. Term, 1898, by Philip Hill, from judgment of O. & T. Allegheny Co., June T., 1897, No. 18, on verdict of guilty. Before STERRETT, C.J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Indictment for murder. Before SLAGLE, J.

Nolle pros as to defendant, Earley Banks. Not guilty as to defendant, James Hill. Guilty of murder of the first degree as to defendant, Philip Hill, and judgment on the verdict.

The facts appear by the opinion of the Supreme Court.

*Errors assigned* were as follows: (1) the evidence was not sufficient to warrant a conviction of murder in the first degree; (2) the verdict of the jury was against the evidence; (3) the learned judge did not sufficiently instruct the jury on the law of homicide and the facts of this case.

*George H. Kane,* with him *W. H. Stanton* and *George W. McLain,* for appellant.

No paper-book was filed for appellee.

OPINION BY MR. JUSTICE MITCHELL, April 11, 1898:

The errors assigned are of the most formal and perfunctory kind, and are sufficiently answered in the opinion of the learned judge below refusing a new trial. There is nothing in the case to justify bringing it here, and indeed there is considerable ground for belief that it was never intended in good faith to

reach a hearing in this Court. It is a flagrant example of the perverted standard of professional ethics which assumes that counsel should help his client to escape the proper consequences of his act by any move or device, short perhaps of actual fraud or imposition. This is a very serious error, and apparently becoming more widespread, especially in cases involving life. The boundaries of professional privilege and professional obligation are clearly defined and in no way doubtful. Counsel represents the prisoner to defend his rights. In so doing he is bound to exercise competent learning, and to be faithful, vigilant, resolute. But he is at the same time an officer of the court, part of the system which the law provides for the preservation of individual rights in the administration of justice, and bound by his official oath to fidelity as well to the court as to the client. It was well said by the Chief Justice in Commonwealth v. Jongrass, 181 Pa. 172 : " There is no code of professional ethics which is peculiar to the criminal courts. There are no methods of practice to be tolerated there that are not equally entitled to recognition in the civil courts." The duty of the counsel is to see that his client is tried with proper observance of his legal rights, and not convicted except in strict accordance with law. His duty to his client requires him to do this much, his duty to the court forbids him to do more. An independent and fearless bar is a necessary part of the heritage of a people free by the standards of Anglo-Saxon freedom, and courts must allow a large latitude to the individual judgment of counsel in determining his action, but it must never be lost sight of that there is a corresponding obligation to the court, which is violated by excessive zeal or perverted ingenuity that seeks to delay or evade the due course of legal justice.

The serious question in this case, and the only one, is whether the appeal to this Court without special allocatur was a supersedeas of execution. The appellant was sentenced on July 31, 1897, and the governor fixed December 8 as the day of execution. On the morning of that day the counsel of appellant entered the appeal in the office of the prothonotary of this Court at Pittsburgh, and the sheriff of Allegheny county, being advised that the question of supersedeas was at least open to doubt, deemed it his duty to postpone the execution. The practical importance of the matter is so great that we think proper

to consider it, although not specifically raised by any motion of record. The doubt seems to have arisen under the Act of May 19, 1897, P. L. 67, regulating the practice, etc., on appeals to the Supreme and Superior Courts. But an examination of the provisions of that act in connection with the prior acts repealed by it, shows that the doubt is not well founded.

Without going farther back in the history of the law than the statutes in force in 1897 we find that by the act to "consolidate, revise and amend the laws" relating to penal proceedings and pleadings, passed March 31, 1860, sec. 33, P. L. 439, all persons indicted in the Quarter Sessions or any county court of Oyer and Terminer might remove the indictment and all proceedings thereon, into the Supreme Court, by certiorari or writ of error, but only upon special allowance by the Supreme Court or a justice thereof. By section 57 of the same act, P. L. 444, the defendant in an indictment for murder or voluntary manslaughter may have a bill of exceptions to the decision of the trial court on any point of evidence or law, and a writ of error thereon, after conviction and sentence; but by section 59 no such writ could issue except by special allowance made upon application within thirty days after sentence. By the Act of February 15, 1870, P. L. 15, in cases of murder and voluntary manslaughter, a writ of error was made of right, and might be sued out on the oath of the defendant as in civil cases. And as to all cases of felonious homicide, a review by the Supreme Court is made a constitutional right by section 24 of article 5 of the constitution of 1874. At that time the statutory limitation for writs of error was two years, and the inconvenience and delay of justice by a review at the mere will of the prisoner for such a period was too great to be long endured. By the Act of March 24, 1877, P. L. 40, "to prevent delay in the review of capital offenses in the Supreme Court," it was enacted that no writ should issue in such cases after twenty days from sentence unless specially allowed by the Supreme Court or a judge thereof.

It thus appears that by the state of the law in 1897, an appeal in any case of felonious homicide was of right upon the mere oath of the prisoner that it was not intended for delay, but in capital cases by the act of 1877 it could not issue more than twenty days after sentence without special allowance. The act of May 19, 1897 expressly repealed the act of March 24, 1877,

and hence, apparently, arose the questions whether an allocatur is necessary in any case, and whether an appeal does not operate as a supersedeas of execution, without regard to the time when it is taken. These questions however overlook the purpose and language of the act of 1897. The act of 1877 and many other acts, including most of those heretofore cited, were expressly repealed, not necessarily to change the law as therein enacted, but in order, in the words of the last clause of section 22, that the act of 1897 "shall furnish a complete and exclusive system in itself on all appeals to such appellate courts."

Turning then to the act of 1897 as the exclusive guide, we find that all appeals of every kind in civil and criminal cases are classed together and put under the same limitation of time. The language of section 1 is " in every case in which an appeal is taken to the Supreme or Superior Court," etc., and by section 4, "no appeal shall be allowed in any case unless taken within six calendar months from the entry of the sentence, order, judgment or decree appealed from, nor shall an appeal supersede an execution issued or distribution ordered, unless taken . . . . within three weeks from such entry." This limitation includes criminal as well as civil cases, not only by the generality of the language and the use of the appropriate word " sentence," but also by the clear intent as shown in the latter part of the same section that appeals taken after the time specified shall be quashed on motion, " provided that in civil cases in which the right of appeal to the Superior Court has now expired," i. e., at the date of the act, an appeal may be taken within three months from the time the act goes into effect.

It is therefore clear that, although appeals in criminal cases, including capital cases, are allowed as of right upon the oath of the prisoner as in civil cases that they are not for the purpose of delay, yet they do not supersede execution issued unless taken out within three weeks from sentence. As already noted the governor had issued his mandate to the sheriff of Allegheny county appointing December 8, 1897, as the day of execution of the appellant.

The origin of the issue of a mandate by the governor in capital cases is not entirely clear. It was called in question by an assignment of error in Cathcart v. Com., 37 Pa. 108, but this court merely said that was a " novel exception to be taken at

this late period in the history of the commonwealth, as the power had always been exercised by the Governor," and referred to the act of May 31, 1718, that on conviction judgment should be given " according to the manner, form and direction of the laws of that part of Great Britain called England, in like cases." But it was also said that this provision was hardly necessary, for without it our courts, being common-law courts, would have had that power unless restrained by statute. And it is clear that the practice was established before the act of 1718. It is impliedly recognized in the laws of 1664, under the charter of New York, which covered the territory on the South or Delaware river, now included in Pennsylvania. " No man condemned to die shall be put to death within four days next after his condemnation unless the Governor see special cause to the contrary : " The Duke of Yorke's Book of Laws, p. 24. The earliest instance that appears in our records is found in the minutes of the Provincial Council of May 19, 1688, at which a petition was read from John Richardson in behalf of his sister Judith Roe who had sentence of death passed upon her in a Provincial court held in Kent county, beseeching that the Governor would be pleased to grant a reprieve ; and it was ordered that a warrant should be sent to the sheriff to suspend her execution until further order : 1 Colonial Records (2d ed.), 227. And at a meeting on March 4, 1689, " the Governor acquainted ye Council that he had received instructions from ye Chief Governor wherein he was pleased to direct that ye murtherous woman's sentence should proceed, ye case being notorious and barbarous," and thereupon the governor and council, having examined the record, ordered that the previous order of suspension be of no further force, and that the sheriff do cause execution to be done according to the tenor of the judgment, "and that ye day for doing thereof be on ye fifteenth day of this first month commonly called March: " 1 Col. Records, 209, (2d ed. 252). At a meeting of the council held November 5, 1720, " the attorney general informed the Governor that two criminals which at the last court of Oyer and Terminer held in Philadelphia, were convicted, viz : a man (by name Edw. Hunt), for high treason, having counterfeited the current coin, and a woman (Anne Hudson) for burglary, lay now in Philadelphia gaol under sentence of death, but that no

execution had been yet awarded that he knew of.  One of the judges present observed that the Governor being abroad when sentence was pronounced, the judges had delayed awarding the execution to give the criminals a reasonable time for making their application to the Governor, lest they had anything to offer which could entitle them to any share of his mercy, but the Governor declared that no such thing had yet been offered to him, and that it was his steady resolution not to interpose his authority or suspend the execution of any legal sentence, except when either a certificate from the judges, or other weighty recommendation from this board should offer such reasons to him as might convince his conscience that such an interposition was prudent, just or necessary." The matter not being concluded, the council adjourned until November 9, when "the Governor acquainted the board that the day before he had issued his warrants for executing the sentence of death against the criminals mentioned at the last council, and that the 19th instant being the day appointed for the said execution, there was sufficient opportunity given for an application from the judges, if there was anything of that kind to be offered:" 3 Col. Rec. (ed. 1852) 109.

The practice may have grown out of deference to the power to reprieve and pardon, inherent in the king's prerogative, and expressly granted in the charter to Penn as to all crimes and offenses, "treason and wilful and malicious murder only excepted, and in those cases to grant reprieves until our pleasure may be known therein:" Duke of Yorke's Book of Laws, 83. The jealous care with which even the liberal Penn maintained his proprietary rights is well known, and in the present regard it was no doubt aided by the tenderness in the taking of life, which even at that early day had begun to show itself among the Quakers, a tenderness which only a little later made Pennsylvania the pioneer of the civilized world in the amelioration of the bloody codes of criminal law. The minutes of the council of 1720, already cited, show that some members were then opposed to the infliction of the death penalty even for so serious a crime as counterfeiting, although considered a branch of treason. It is not improbable also that the practice may have been aided by the absence of courts of supreme authority as the direct representatives of the king. The warrant for exe-

cution, at common law, was issued by the court that pronounced judgment. The superior courts at Westminster and the Commissions of Oyer and Terminer issued warrants of death which proprio vigore were sufficient authority, 2 Hale, Pleas of the Crown, 409, and the court of King's Bench being in theory of law held before the king himself had further power to order the execution of judgments upon attainder in parliament or in other courts: 2 Hale, Pleas of the Crown, 4; 2 Hawkins' P. C. c. 50, sec. 17; Earl Ferrers's Case, Foster Cr. C. 140. But it appears by the report of Doyle's Case, 1 Leach, 67, that after a sentence of death by the recorder's court of the city of London, the king's sign manual was obtained before warrant of execution. Blackstone speaks of the " more solemn and becoming exactness " used in London, 4 Com. 404, but does not discuss the reason of the difference in practice. Many of the first settlers of Philadelphia were from London, and probably tenacious of their privileges as citizens of that great city which Lord CAMPBELL says had long been " a sort of free republic in a despotic kingdom: " 1 Lives of the Lord Chancellors, p. 8. The influence of the customs of London on our early institutions is well known (Wimmer's Appeal, 1 Whart. 96), and included among other things the establishment of the recorder as a judicial officer next in authority to the mayor in the charter of 1691: Allinson and Penrose, Hist. of Philadelphia, pp. xlvii and 13–14; Respublica v. Dallas, 3 Yeates, 300, s. c. 4 Dall. 229; Rhoads v. Com., 15 Pa. 272. He was the only judge of the first courts of Oyer and Terminer required to be learned in the law, and it is natural to suppose that before awarding execution involving life he would follow the precedent of his London prototype, and obtain the sign manual of the proprietary or his locum tenens, the governor, as the representative of the crown.

Whatever the origin of the procedure, it was firmly established in the earliest days of the province, and passed into the practice of the commonwealth. I am informed by the courtesy of the governor and the secretary of the commonwealth that the executive minutes show the issue of a warrant by Governor Mifflin, January 22, 1791, to the sheriff of Delaware county for the execution on the 29th of the same month of one William Gelaspie for murder, being the first warrant issued under the constitution of

1790, and the records of all similar warrants have been regularly preserved from that date. The governor's warrant is referred to in the Acts of April 10, 1834, P. L. 234, and March 31, 1860, P. L. 450, sec. 76. And by the act of the same date, March 31, 1860, to consolidate, revise and amend the penal laws, P. L. 402, sec. 75, the record of all convictions of murder of the first degree is required to be sent to the governor within ten days after sentence, plainly for the information of the governor in order to issue his mandate for execution.

The same practice prevails in some other states though usually regulated by statute. See Costley v. Com., 118 Mass. 35; Lowenberg v. People, 27 N. Y. 336; In re Dyer, 56 Kan. 489; Holden v. Minnesota, 137 U. S. 483; State v. Oscar, 13 La. Ann. 297.

The mandate of the governor authorizes and requires the sheriff "to cause the sentence of the said court to be executed upon the said" A. B. on a day named, between specified hours and in the manner directed by the act of assembly, etc.*   By its

---

*The following forms of the warrant and subsequent proceedings are directed to be reported as precedents. I am indebted for them to the courtesy of William Grew, Esq., Solicitor for the Sheriff of Philadelphia County.

**No. 1.**

IN THE NAME AND BY AUTHORITY OF THE COMMONWEALTH
OF PENNSYLVANIA,

EXECUTIVE DEPARTMENT.

To ALEXANDER CROW, JR., ESQUIRE,
          High Sheriff of the County of Philadelphia,
     or your successor in office                    GREETING:

WHEREAS, At a Court of Oyer and Terminer and General Jail Delivery held at Philadelphia, in and for the County of Philadelphia, February Sessions, 1897, a certain Pasquale Dadario, was tried upon a certain indictment charging him with the crime of Murder, and was on the Twenty-Fifth day of February, Anno Domini one thousand eight hundred and ninety-seven, found guilty of Murder of the First Degree, and was thereupon to wit: on the thirtieth day of March, Anno Domini one thousand eight hundred and ninety-seven, sentenced by the said Court, that, he the said Pasquale Dadario, be taken hence to the jail of the County of Philadelphia whence he came, and thence to the place of execution, and that he be there hanged by the neck until he is dead.

express terms therefore as well as from its purpose and effect, it is an "execution issued" within the act of 1897, and was not

---

*Now Therefore,* This is to authorize and require you the said Alexander Crow, Jr., Esquire, High Sheriff of the County of Philadelphia as aforesaid, or your successor in office, to cause the sentence of the said Court of Oyer and Terminer and General Jail Delivery to be executed upon the said Pasquale Dadario on the twenty-seventh day of July, Anno Domini one thousand eight hundred and ninety-seven, between the hours of ten o'clock A. M. and three o'clock P. M., in the manner directed by the seventy-sixth section of the Act of General Assembly of this Commonwealth, approved the thirty-first day of March, Anno Domini one thousand eight hundred and sixty, entitled "An Act to consolidate, revise and amend the laws of this Commonwealth relating to penal proceedings and pleadings;" and for so doing this shall be your sufficient warrant.

{ SEAL } Given under my hand and the Great Seal of the State, at the City of Harrisburg, this fourteenth day of June in the year of our Lord one thousand eight hundred and ninety-seven, and of the Commonwealth the one hundred and twenty-first.

DANIEL H. HASTINGS.

By the Governor
JAS. E. BARNETT
*Deputy Secretary of the Commonwealth.*

◆●●▶

### No. 2.

In The Matter of the execution of Pasquale Dadario, convicted of murder of the first degree in the Court of Oyer and Terminer and Quarter Sessions of the Peace for the City and County of Philadelphia.

---

*To his Excellency the Governor of the Commonwealth of Pennsylvania:*

I do hereby certify and return that in obedience to the command contained in a certain Warrant to me directed, dated the fourteenth day of June, A. D. 1897, I caused the sentence of death, by hanging by the neck, to be executed upon the body of the said Pasquale Dadario within the walls of the County Prison, in the County aforesaid, on the twenty-seventh day of July, A. D. 1897, at         o'clock and         minutes.

The residue of the execution of said Warrant will appear in a schedule hereto annexed.

So answers,

ALEX. CROW, JR., *Sheriff.*

◆●●▶

### No. 3.

| Commonwealth vs. Dadario. | In the Oyer and Terminer and Quarter Sessions of the Peace for the City and County of Philadelphia. |
|---|---|

The said defendant convicted of murder of the first degree.

superseded by an appeal taken more than three weeks after sentence. The sheriff is in default for failure to obey the warrant

---

Oath of Alexander Crow, Jr., Esq., Sheriff of the County of Philadelphia, in compliance with the provisions of Section 76 of an Act passed March 31st, 1860, entitled, "An Act to Consolidate, revise and amend the laws of this Commonwealth relating to Penal proceedings and pleadings."

City and County of Philadelphia, ss.

Alexander Crow, Jr., Esq., Sheriff of the County of Philadelphia, being duly sworn, according to law, saith, that in obedience to the command contained in a Warrant of the Governor of the Commonwealth of Pennsylvania, dated the fourteenth day of June, A. D. 1897, and directed to this affiant as Sheriff aforesaid, he did cause the sentence of death by hanging by the neck to be executed upon the body of the above named Pasquale Dadario, within the walls of the County Prison, in the County aforesaid, on the 27th day of July, A. D. 1897, at          o'clock and          minutes.

ALEX. CROW, JR.

Sworn to and subscribed before
me this twenty-seventh day of
July, A. D. 1897.

◄●●►

No. 4.

In The Matter of the execution of Pasquale Dadario, convicted of murder of the first degree.

(Here names of Jurors are inserted.)

being duly sworn, according to law, do depose and say, that as jurors, summoned by Alexander Crow, Jr., Esq., Sheriff of the County of Philadelphia, they will witness the execution of Pasquale Dadario, and certify the time and manner of said execution, according to law.

Sworn to and subscribed
before me, this 27th day
of July, A. D. 1897.          (Signatures of the jurors.)

ALEX. CROW, JR., *Sheriff.*

◄●●►

No. 5.

CERTIFICATE OF JURORS.

Philadelphia County Prison, July 27th, 1897.

In The Matter of the execution of Pasquale Dadario, convicted of murder of the first degree, We, the undersigned jurors, summoned by Alexander Crow, Jr., Esq., Sheriff of the County of Philadelphia, to witness

on the day named and is technically liable as for an escape. The question therefore arises as to the further steps in the case.

At common law the time of execution was no part of the judgment and was not usually fixed in the sentence (though the court had power to do so if it thought proper, Rex v. Wyatt, Russ. & Ryan, C. C. 230). The opinion of the twelve judges on the subject was certified to the Lord Chancellor in Doyle and Valline's Case, 1 Leach C. C. 67. " The sheriff upon receipt of his warrant is to do execution within a convenient time, which in the country is also left at large: " 4 Blackstone, 404. And in the case of Rex v. Rogers et al., 3 Burr. 1809, " the court were of opinion not only that it was not incumbent on them to name the day but even that it was more proper for them not to do it. It is not usual at the assizes. The sheriff will do as he thinks proper." See also Cathcart v. Com., 37 Pa. 108; Costley v. Com., 118 Mass. 1; Schwab v. Berggren, 143 U. S. 442. In 1752 however the act of 25 Geo. II, c. 37, directed the execution to be on the next day but one after sentence unless that should be Sunday, and in such case, on the Monday following: 7 British Stat. at Large, 440.

The time of execution being no part of the judgment but a mere executive or ministerial act in pursuance of it, the judgment is not affected by the prisoner's escape, or other occurrence which merely prevents or delays execution. The judgment is not satisfied until the sentence be fully carried out. " If the party be hanged, and cut down and revive again, yet he must be hanged again, for the judgment is to be hanged by the neck till he be dead:" 2 Hale, P. C. 412; 2 Hawkins, P. C. c. 51, sec. 7.

So if for any other reason, not affecting the validity of the judgment, the appointed day be allowed to pass without execution, the sheriff must proceed. In State v. Kitchens, 2 Hill (S. C.), 612, the sheriff died after the date of the sentence, and

---

the execution of Pasquale Dadario, first having been duly qualified, do hereby certify that we were present and saw the said Pasquale Dadario executed by hanging by the neck, within the walls of the County Prison, in Philadelphia, at          o'clock and          minutes, on Tuesday, the twenty-seventh day of July, A. D. 1897, in pursuance of the provisions of the Act of Assembly in such case made and provided.

(Signatures of the jurors.)

when the day of execution arrived there was no sheriff to carry it out. The prisoner thereupon moved for a discharge, but on appeal the Supreme Court by O'NEALL, J., reviewed the authorities and held that " the judgment can only be satisfied by an actual execution, and if the execution attempted is prevented by accident from being effectual, still the judgment of the law remains and must be executed." This was followed in Ex parte Nixon, 2 So. Car. 4, where it was said that " the time was nothing more than a direction to the officer that he should enforce it (the judgment) on a particular day. If he failed in the duty on the day, he might be amenable to the law, but the force of the judgment would still remain."

Where there is an actual escape and a recapture, the party so taken has a right to a day in court to deny his identity as the person sentenced. In Middleton's Case, Popham, 131 (1617), the prisoner, after sentence, escaped, and being retaken was brought to the bar and, on his confession that he was the same party who was condemned, the court awarded execution. So in Rex v. Okey et al., 1 Levinz, 61 (1662), the prisoners (three of the regicides) pleaded that they were not the same persons attainted by the act of parliament, and issue being taken on this, a jury was forthwith summoned, and the court held that the only question was the identity, " quia ils ne sont ore d'estre try pur le treason, mes del identity des persons," and the jury finding that they were the same persons, execution was awarded.

Where, as in some states by statute or custom, the date of the execution is fixed by the court, and is an integral part of the sentence, and the day is passed, the cases seem to require that the court should fix a new day: Ex parte Howard, 17 N. H. 545; Bland v. State, 2 Carter (Ind.), 608; Nicholas v. Com., 91 Va. 813; State v. Cardwell, 95 N. C. 643; In re Cross, 146 U. S. 271; and Aaron v. State, 40 Ala. 307. The last two cases, however, appear to be ruled on express statutory directions for the contingency raised in them. The foregoing cases rest largely on the authority of Earl Ferrers's Case, Foster, Cr. C. 140. Lawrence, Earl Ferrers, was tried and convicted of murder by the House of Peers sitting as a High Court of Parliament, and the question arose whether he should be sentenced under the special provisions of the act of 25 Geo. II, c. 37, heretofore referred to, which among other things fixed the time of

execution and the disposal of the body afterwards. The house resolved to take the opinion of the twelve judges, and, foreseeing that the second day from sentence fixed by the statute for execution might pass before settlement of the matter, included in the questions to the judges, whether if the appointed day should lapse before execution done, a new time might be appointed and by whom. The judges delivered their opinion that a new time might be appointed either by the High Court of Parliament or by the court of King's Bench, the parliament not then sitting, and the record of the attainder being properly removed into that court. The difficulty on this point in Ferrers's case arose from the fixing of the time of execution by the statute. The materiality of this fact does not seem to have been always observed in the foregoing American cases, though I make this observation with becoming hesitation, conceding the difficulty of weighing the influence of statutes and local customs in the decisions of other states.

Where, as in the present case, the escape is merely constructive, and the time is no part of the sentence, there is no further fact or issue to try or supplementary change to be made in the judgment. Neither the precedents nor the principles on which they were decided seem to require the mere formality of the fixing of a second date of execution. The governor's mandate is in full force, unaffected by anything that has occurred since (the appeal not being a supersedeas), and the failure of the sheriff to obey it on the day is no reason for continued disobedience in the future, or for requiring either the court or the governor to go through a formal repetition of their action. Indeed there are serious objections to holding that it is within the power of a hesitating or contumacious sheriff to so obstruct the administration of justice. Of course, what is here said is not meant to reflect on the sheriff in the present case, as he acted under the advice of counsel upon a doubt raised by a new statute, but it is his plain duty now to proceed upon the mandate already in his hands, and any undue delay on his part will subject him to the very serious consequences of an escape.

Judgment affirmed and record remitted for purpose of execution.