## Commonwealth ex rel. *v.* Griest.

*Constitutional law—Amendment—Approval of governor—Article* 18 *of the constitution of* 1874.

Under article 18 of the constitution of 1874 relating to amendments, an amendment of the constitution proposed by joint resolution of the general assembly need not be submitted to the governor for his approval or veto.

The 26th section of the 3d article of the constitution which provides that " every order, resolution or vote " of the two houses shall be submitted to the governor for his approval or disapproval refers merely to legislation, and has no reference to the action which the two houses take in performing their part of the work of creating amendments.

Article 18 and the 26th section of article 3 are not inconsistent with each other, and both may stand and be fully executed without any conflict. One relates to legislation only, and the other relates to the establishment of constitutional amendments. Each one contains all the essentials for its complete enforcement without infringing at all upon any function of the other.

*Constitutional law—Amendments—Publication—Cost of publication.*

The secretary of the commonwealth cannot allege as ground for refusing to publish a proposed amendment to the constitution as provided by article 18 of the constitution that no appropriation had been made to defray the cost of publication.

It is not absolutely necessary that the publication of an amendment shall be made three months before the general election which follows next after the amendment was agreed to by the two houses.

The provision in article 18 as to the publication of a proposed amendment three months before the next general election should be regarded as merely a directory provision where strict compliance with time limit is not essential.

Where the secretary of the commonwealth has neglected or refused to publish a proposed amendment until after the general election next following the session at which the amendment was proposed, he may be mandamused to make publication for three months prior to the succeeding general election at which members of the legislature are voted for.

Where a thing is to be done on or before a certain date, and a literal compliance as to the date becomes impossible without fault of the power

which created the duty, the thing may be done or the act performed as soon as it becomes possible to be done after the time fixed has passed.

Argued May 14, 1900. Appeal, No. 8, May T., 1900, by plaintiff, from judgment of C. P. Dauphin Co., Commonwealth Docket, 1899, No. 31, dismissing petition for mandamus in case of commonwealth ex rel. the Attorney General v. W. W. Griest, secretary of the Commonwealth. Before GREEN, C. J., MC-COLLUM, MITCHELL, DEAN, FELL, BROWN and MESTRE-ZAT, JJ. Reversed.

Petition for mandamus.

The petition was as follows :

1. That on April 4, 1899, the house of representatives of the commonwealth aforesaid passed a resolution proposing an amendment to the constitution, the language of which is as follows :

" Section 1. Be it resolved by the senate and house of representatives of the commonwealth in general assembly met, that the following is proposed as amendments to the constitution of the commonwealth of Pennsylvania, in accordance with the provisions of article 18 thereof :

" AMENDMENT 1 TO ARTICLE 8, SECTION 1.

" Add at the end of the 1st paragraph of said section, after the words ' shall be entitled to vote at all elections,' the words, ' subject, however, to such laws requiring and regulating the registration of electors as the general assembly may enact,' so that the said section shall read as follows :

" Section 1. Qualification of Electors.—Every male citizen twenty-one years of age, possessing the following qualifications, shall be entitled to vote at all elections, subject, however, to such laws requiring and regulating the registration of electors as the general assembly may enact:

" 1. He shall have been a citizen of the United States at least one month.

" 2. He shall have resided in the state one year (or, if having previously been a qualified elector or native born citizen of the state he shall have removed therefrom and returned, then six months) immediately preceding the election.

" 3. He shall have resided in the election district where he

shall offer to vote at least two months immediately preceding the election.

"4. If twenty-one years of age and upwards, he shall have paid within two years a state or county tax, which shall have been assessed at least two months and paid at least one month before the election.

### "AMENDMENT 2 TO ARTICLE 8, SECTION 7.

"Strike out from said section the words 'but no elector shall be deprived of the privilege of voting by reason of his name not being registered,' and add to said section the following words, 'but laws regulating and requiring the registration of electors may be enacted to apply to cities only; Provided, That such laws be uniform for cities of the same class,' so that the said section shall read as follows:

"Section 7. Uniformity of Election Laws.—All laws regulating the holding of elections by the citizens or for the registration of electors shall be uniform throughout the state, but laws regulating and requiring the registration of electors may be enacted to apply to cities only; Provided, That such laws be uniform for cities of the same class."

2. That the said house of representatives also passed another resolution proposing an amendment to the constitution, the language of which is as follows:

"Section 1. Be it resolved by the senate and house of representatives of the commonwealth of Pennsylvania in general assembly met, that the following is proposed as an amendment to the constitution of the commonwealth of Pennsylvania, in accordance with the provisions of article 18 thereof:

### "AMENDMENT.

"Strike out section 4 of article 8 and insert in place thereof as follows:

"Section 4. All elections by the citizens shall be by ballot or by such other method as may be prescribed by law; Provided, That secrecy in voting be preserved."

3. That the said proposed amendments were introduced into the legislature in the shape of joint resolutions, were referred to the proper committees, reported therefrom with an affirmative recommendation, read at length on three separate days,

considered and agreed to, passed each branch of the legislature with a majority of all the members elected thereto, were signed by the speaker of the house and the president of the senate, were entered upon the journals thereof with a list of the yea and nay votes cast for and against each amendment, after which they were certified to the governor like other bills and resolutions requiring his approval.

4. That the governor, in view of the fact that the question of his right to approve or disapprove legislation and resolutions proposing amendments to the constitution had not been decided by the courts of our state, and it having been the general practice of the legislature to submit such amendments to the chief executive, like other bills and resolutions, and the precedents in a number of cases seeming to establish the right of the governor to pass upon resolutions proposing amendments to the constitution, he concluded to exercise the veto power and did lodge in the office of the secretary of the commonwealth, with his objections thereto, the resolutions aforesaid within a period of thirty days after the adjournment of the legislature.

5. That the said W. W. Griest, secretary of the commonwealth, after having received said resolutions and veto messages, caused the same to be filed in his office, and treated said proposed amendments like other bills and resolutions which had been disapproved by the governor, and for this reason refused to have them published and printed in the pamphlet laws.

6. That George Burnham, Jr., a citizen, taxpayer, and qualified elector of said commonwealth, has presented a petition to the attorney general, setting forth all these facts, and also contending that article 18, which provides for the future amendment of the constitution, did not contemplate the necessity for the submission of joint resolutions proposing special amendments to the constitution for the approval or disapproval of the governor, and that, by reason of this fact, the governor exceeded his proper prerogative, and that, notwithstanding his veto of said resolutions, the secretary of the commonwealth should still proceed to make publication of the proposed amendments as required in article 18 hereinbefore mentioned.

7. That the next general election after the adjournment of the last legislative session will be held on Tuesday, November 7, 1899, and that publication " to be published three months

before the next general election " should begin on August 7, 1899.

8. That the said W. W. Griest, secretary of the commonwealth, having been requested to make publication of said proposed amendments by counsel for the said George Burnham, Jr., did, on July 13, 1899, notify him by letter that the governor having interposed the veto power, he did not feel warranted in making, and would not make, the publication of the same.

That your relator, in order to have the questions involved in the controversy judicially determined, and because there is no other adequate and specific remedy at law to inquire into said questions, prays this honorable court to grant a rule to show cause why a writ of mandamus should not be issued to, or make such other order as the law may require upon W. W. Griest, secretary of the commonwealth as aforesaid, commanding him to make arrangements and contracts for the publication of said proposed amendments in at least two newspapers in every county in which such newspaper shall be published, and to have such publication made as is required by article 18, providing for the future amendment of the constitution, and to give such other instructions in reference thereto, and in all other matters so perform his duties in connection therewith as the court may direct and the law require, so that said publication may be made not later than Monday, the 7th day of August next, or at such time as the law may require.

Defendant filed the following answer :

1. He admits that the resolution set forth in paragraph 1 of relator's petition was passed and adopted by the house of representatives of Pennsylvania and by the senate of Pennsylvania.

2. He admits that the resolution set forth in paragraph 2 of relator's petition was proposed in the house of representatives and adopted and passed by the house of representatives and the senate of Pennsylvania.

3. He admits that said amendments were considered, adopted, signed, entered and certified to the governor, as set forth in paragraph 3 of relator's petition.

4. He admits that the governor vetoed and disapproved said resolutions, as set forth in paragraph 4 of relator's petition.

5. He admits that he, the respondent, secretary of the commonwealth, declined and refused to publish and print said resolutions in the pamphlet laws, as set forth in paragraph 5 of relator's petition.

6. He admits the facts concerning the petition of George Burnham, Jr., as set forth in paragraph 6 of relator's petition, denying, however, that the governor exceeded his proper prerogative in disapproving said joint resolutions, and insisting, averring and maintaining that the governor properly exercised his prerogative in disapproving said resolutions, and that he, the respondent, was justified in not making publication of the proposed amendments in the newspapers of the commonwealth.

7. He admits that the next general election will be held on November 7, and, in order to be published three months before the next general election, the publication of these proposed amendments must begin on August 7, 1899, and he avers and declares that it is impracticable and impossible, should a mandamus issue, to make the necessary contracts and secure publication of the proposed amendments three months before the next general election in at least two newspapers in every county of the state in which such newspapers shall be published.

8. He admits the letter and answer of George Burnham, Jr., of July 13, 1899, as set forth in exhibit A of relator's petition.

9. He further avers and answers that he is not, and should not be, required to publish the said amendments, and that no mandamus should issue in this case, and that the relator's petition should be dismissed and the rule be vacated, for the following reasons:

(1) The governor having disapproved the resolutions proposing said amendments to the constitution, as set forth in relator's petition, the same are without validity and are of no binding effect.

(2) Neither house of the general assembly having passed and adopted said resolution, the governor's veto notwithstanding, they are invalid and of no binding effect on respondent.

(3) The governor of the commonwealth has a right, according to the constitution thereof, to pass upon, to approve or

disapprove all joint resolutions adopted by the legislature, except such as provide for its adjournment.

(4) The legislature having appropriated no money to pay the costs of the publication of said resolutions, the respondent having, by careful inquiry, ascertained, now states as his belief that the proper publication of said resolutions in the newspapers of the state, as contemplated by law, would cost not less than $40,000, and as he is without any funds to pay the same, or any part of the same, he has no right to contract such indebtedness without previous warrant of law, and no officer of the state is authorized to pay said expenses, nor to draw any warrant for the payment of the same.

(5) Even if there were any warrant of law for incurring the expenses of said publication, there is at present no funds nor money in the treasury of the commonwealth of Pennsylvania, not otherwise appropriated, out of which said expenses could be paid.

The court in an opinion by WEISS, J., discharged the rule for mandamus.

*Error assigned* was the order of the court.

*Henry Budd, David Wallerstein* and *Clinton Rogers Woodruff*, with them *George W. Guthrie* and *William F. Darby*, for appellant.—The governor's signature was not necessary: State ex rel. Morris v. Mason, 43 La. Ann. 648; In re Senate File No. 31, 25 Neb. 864; Hollingsworth v. Virginia, 3 Dall. 378.

A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced: Cooley's Constitutional Limitations (6th ed.), p. 99; DeTurk v. Com., 129 Pa. 151; McCafferty v. Guyer, 59 Pa. 111; Thomas v. Owens, 4 Md. 189; State v. Babcock, 19 Neb. 230; Ewing v. Orville Mining Co., 56 Cal. 649; Hills v. Chicago, 60 Ill. 86; People v. Rumsey, 64 Ill. 44; Tuttle v. Nat. Bank, 161 Ill. 497; Friedman v. Mathes, 8 Heisk. (Tenn.) 488; Mallon v. Hyde, 76 Fed. Repr. 388; State v. Holmes, 12 Washington, 169; People v. Hoge, 55 Cal. 612.

*W. U. Hensel* and *M. E. Olmsted*, for appellee.—The secretary of the commonwealth was not obliged to incur an ex-

penditure of $40,000 without any legislative provision for its payment.

The secretary of the commonwealth will not be mandamused to do a vain thing, e. g. to publish in A. D. 1900 constitutional amendments ninety days prior to the general election of 1899: James v. Commissioners, 13 Pa. 72; Heffner v. Com., 28 Pa. 108.

A relator is not entitled to the writ even from the appellate court unless he can show a legal duty then due, at the hands of the respondent: Spelling on Extraordinary Relief, sec. 1385; The State ex rel. Price v. Carney, 3 Kan. 81; Rex v. Askew, 4 Burr, 2189; Short on Mandamus (text book series), 227; The King v. Bishop of London, 1 Wils. 11; Regina v. Northwich Savings Bank, 9 A. & E. 729; Regina v. London & Northwestern Ry. Co., 6 Ry. Cas. 634; Regina v. Blackwall Ry. Co., 9 Dowl. 558; Regina v. Trustees of the Rochdale, etc., Turnpike Co., 12 Q. B. 448; Williams v. Lincoln County Commissioners, 35 Me. 345; North v. University of Illinois, 137 Ill. 296: Gormley v. Day, 114 Ill. 185; Colvard v. Graham County Commissioners, 95 North Carolina, 515.

The constitution of Pennsylvania contemplates and requires that amendments proposed by joint resolution of general assembly shall be submitted to the governor for his approval or veto: Hatch v. Stoneman, 66 Cal. 632.

OPINION BY MR. CHIEF JUSTICE GREEN, May 29, 1900:

The pleadings in this case develop the question, whether a proposed amendment to the constitution of Pennsylvania must be submitted to the governor for his action thereon, in the course of the proceedings for its establishment. The solution of the question depends upon the interpretation to be given to the 18th article of the constitution of 1874. That article is the last of all the articles of the constitution, and it is entitled as follows and is in the following words:

## "ARTICLE XVIII.

### "FUTURE AMENDMENTS.

"Section 1. Any amendment or amendments to this constitution may be proposed in the senate or house of representatives; and if the same shall be agreed to by a majority of the members elected to each house, such proposed amendment or amend-

ments shall be entered on their journals with the yeas and nays taken thereon and the secretary of the commonwealth shall cause the same to be published three months before the next general election in at least two newspapers in every county in which such newspapers shall be published; and.if in the general assembly next afterwards chosen, such proposed amendment or amendments shall be agreed to by a majority of the members elected to each house the secretary of the commonwealth shall cause the same again to be published in the manner aforesaid.; and such proposed amendment or amendments shall be submitted to the qualified electors of the state in such manner, and at such time at least three months after being so agreed to by the two houses, as the general assembly shall prescribe; and if such amendment or amendments shall be approved by a majority of those voting thereon such amendment or amendments shall become a part of the constitution; but no amendment or amendments shall be submitted oftener than once in five years. When two or more amendments shall be submitted they shall be voted upon separately."

It will be observed that the method of creating amendments to the constitution is fully provided for by this article of the existing constitution. It is a separate and independent article standing alone and entirely unconnected with any other subject. Nor does it contain any reference to any other provision of the constitution as being needed, or to be used, in carrying out the particular work to which the 18th article is devoted. It is a system entirely complete in itself, requiring no extraneous aid, either in matters of detail or of general scope to its effectual execution. It is also necessary to bear in mind the character of the work for which it provides. It is constitution making, it is a concentration of all the power of the people in establishing organic .law for the commonwealth, for it is provided by the article that, "if such amendment or amendments shall be approved by a majority of those voting thereon, such amendment or amendments shall become a part of the constitution." It is not lawmaking, which is a distinct and separate function, but it is a specific exercise of the power of a people to make its constitution. Recurring to this subject later on, and proceeding now to analyze the requirements of the 18th article in the process of creating amendments, we no-

tice in their order the successive particulars to be observed. First, the amendment is to be proposed in the senate or house. Second, it must be "agreed to by a majority of the members elected to each house." Third, it must "be entered on their journals with the yeas and nays taken thereon." Fourth, in immediate sequence to the entry on the journals and as a part of the same sentence, the article provides, "and the secretary of the commonwealth shall cause the same to be published three months before the next general election in at least two newspapers in every county in which such newspapers shall be published."

It will be observed that the duty of the secretary of the commonwealth follows immediately upon the entry of the amendment on the journals of the two houses with the yea and nay votes of the members. There is no other action by any department of the state government that is either required or allowed, prior to the action of the secretary. And that action of the secretary is prescribed in mandatory language, thus, "And the secretary of the commonwealth shall cause the same to be published," etc. He has no discretion in the premises. His action does not depend upon any other action whatever. It is his own, personal, individual and official duty, imperative in its character, and of the very highest and gravest obligation because it is imposed by the constitution itself, and he can only discharge that duty by literally performing its terms. He cannot excuse himself for nonperformance by setting up advice, opinion or action of any other person, organization or department, official or otherwise, for the simple reason that the article of the constitution which prescribes his duty does not allow it. There is no opportunity for any, even the least, intervention, between the entry of the amendment on the journals and the publication in the newspapers in the whole course of the proceeding for the creation of the amendment.

The subsequent provisions of the article are equally devoid of any right or authority to intervene, derived from any source whatever. For, in the fifth place, the articles provide that, "if in the general assembly next afterwards chosen such proposed amendment or amendments shall be agreed to by a majority of the members elected to each house, the secretary of the commonwealth shall cause the same again to be published in

the manner aforesaid." Here again the only precedent to the duty of a second publication by the secretary is the agreement by the two houses to the amendment. The same duty of publication the second time is imposed, and in the same mandatory terms, as in the first. Thus, " the secretary of the commonwealth shall cause the same again to be published in the manner aforesaid." Immediately thereafter follows the provision in the sixth place, that the amendment shall be submitted to a vote of the people, and lastly, if the amendment is approved by a majority of the voters it becomes a part of the constitution. These then are the several stages in the proceedings to create an amendment. A proposal of the amendment in either house, an agreement to the same by both houses, a publication thereof by the secretary of the commonwealth, a second agreement by the two houses, a second publication by the secretary, a vote of the people, which, if a majority vote favorably, causes the amendment to become a part of the constitution.

In the orderly and logical sequence of such preceding facts it follows with, apparently, an unanswerable certainty, that an amendment thus originated, proceeded with and terminated, becomes on integral part of our state constitution.

It remains only to consider the reasons which are urged against the validity of such a conclusion. They are all concentrated and find their only life in the provisions of another article of the constitution, to wit: the third, in the 26th section of which it is contended there is a provision which makes it necessary to the validity of a proposed amendment that it must be submitted to the governor for his action thereon, and that if he disapproves of it, it fails at once, and no further proceedings can take place in the way of its establishment unless his disapproval shall be overcome by a vote of two-thirds of the members of both houses. The seriousness and gravity of this proposition will be at once conceived, when it is considered that it confers upon the governor alone the power to prevent the adoption of an amendment to the organic law of the state, by a mere exercise of his veto power, unless the amendment is passed over his veto by a two thirds vote of the members. It will be necessary to consider the 26th section of the 3d article with care in order to determine the question raised by this contention.

The section is in these words: " Every order, resolution or vote, to which the concurrence of both houses may be necessary except on the question of adjournment, shall be presented to the governor and before it shall take effect be approved by him, or being disapproved shall be repassed by two thirds of both houses according to the rules and limitations prescribed in case of a bill." The question is, must a proposed amendment to the constitution be submitted to the governor and be subjected to the requirement of his approval? The first and most obvious answer to this question is, that the article which provides for the adoption of an amendment is a complete system in itself, from which the submission to the governor is carefully excluded, and therefore such submission is not only not required, but cannot be permitted. It can only be done by reading into the 18th article words which are not there, and which are altogether inconsistent with, and contrary to, the words which are there. Under that article the amendment becomes a part of the constitution without any action of the governor. Under the opposing contention it cannot become a part of the constitution without the positive approval of the governor, when no such approval is either expressed in, or implied from, the explicit words of the article. They cannot be implied because there is no necessity for such implication, and without such necessity there can be no implication. This is a most familiar principle in the construction of mere ordinary statutes, and also in the construction of written contracts. And more than this, if the proposed amendment is to be submitted for the approval of the governor, it follows that if he disapproves it, it may fail altogether and thus an element of defeat be introduced into the 18th article, when that article manifestly does not permit the existence of such an element. The only authorities which have any right to assent or to dissent, to the adoption of the amendment are the two houses of the general assembly, and the people. If these latter vote adversely it falls ; if the two houses do not agree it never has any existence even as a proposition. But nowhere in the article is any other assent, or any other dissent, permitted to affect the question of adoption, nor is there any place in the article into which the necessity or the propriety of any other assent or dissent imported by implication. Therefore it follows, up-

on the most obvious and ordinary principles of statutory interpretation, that, there being no warrant for executive intervention contained in the 18th article, it cannot be placed there by any kind of implication from the 26th section of the 3d article.

But in the second place the language of that section does not purport, nor attempt to impose any such construction upon the 18th article, nor does it give, by expression or by implication, any control over the subject of "future amendments," in the designation of the subjects over which the veto power may be exercised. The 3d article of the constitution is confined exclusively to the subject of legislation. It is entitled "Of legislation" and only purports to be an authorization and limitation of the legislation of the commonwealth. It prescribes the manner in which the business of making laws must be conducted, and the subjects with reference to which it may, and may not, be exercised. Thus in its earlier sections it provides that no law shall be passed except by bill and that no bill shall be so altered by either house as to change its original purpose; that no bill be considered unless referred to a committee, returned therefrom and printed; that no bill except appropriation bills shall be passed containing more than one subject which shall be clearly expressed in its title; that every bill shall be read in each house on three different days and prescribing the terms upon which alone it shall become a law; that all amendments to bills shall be concurred in by a majority of the members of each house and directing the manner in which this shall be done; that bills shall be revived, amended or extended in a particular manner. These provisions cover the first six sections. The 7th section prohibits all local or special legislation upon a great variety of enumerated subjects, and the 8th requires that public notice shall first be given of an intent to pass any kind of local legislation. The remaining sections down to the 26th, contain prohibitive limitations as to some subjects and directory provisions as to others, but all of an exclusively legislative character. Then follows the 26th section providing for the submission of "every order, resolution or vote," to the governor for his approval or disapproval, and how a bill may be passed again notwithstanding his disapproval. Then follow a few further restrictions of the subjects

of legislation, and provisions for criminal penalties for pro-
hibited acts, and with these the article closes.   Nowhere in the
article is there the slightest reference to, or provision for, the
subject of amendments to the constitution.   It is not even al-
luded to in the remotest manner.   On the contrary the entire
article is confined exclusively to the subject of legislation, that
is the actual exercise of the lawmaking power of the common-
wealth in its usual and ordinary acceptation.   It is too plain
for argument that unless there were somewhere else in the con-
stitution, a provision for creating amendments thereto, that
power could not be exercised under any provision of the 3d
article.   It follows that a direction to submit "every order,
resolution or vote" of the two houses, to the governor for his
approval, does not carry with it any other matter than such as
is authorized by the article.   As constitutional amendments are
not authorized by the 3d article they cannot be within the
purview of those orders, resolutions or votes, which must be
submitted for the action of the governor.

But, independently of this consideration, which seems con-
clusive, it is perfectly manifest that the orders, resolutions and
votes, which must be so submitted, are, and can only be, such
as relate to and are a part of the business of legislation, as pro-
vided for and regulated by the terms of article 3.   These are
the affairs that are the exclusive subjects of the article.   They
constitute the matters which are fully and carefully committed
to that department of the government which is clothed with
its whole legislative power.   The things that are to be done by
the two houses are legislative only, and hence, when orders,
resolutions and votes are directed to be submitted to the gov-
ernor it is orders, resolutions and votes referring to matters of
legislation only that are to be so submitted.   It is not contended
that an "order" or a "vote" is an amendment to the consti-
tution, but it is contended that, because a resolution is the
form in which a proposed amendment must be introduced, that
kind of a resolution must be submitted.   This is a non sequitur,
because the word "resolution" has a subject which it neces-
sarily embraces and fills, to wit: legislation, the whole legisla-
tion which may be enacted by the two houses, and it has no
need of an enlarged meaning in order to take in something
which is not otherwise provided for.   But a still more serious ob-

jection to its being enlarged so as to include constitutional amendments is, that the 18th article excludes it from such enlargement, by giving a different name to that thing which the two houses must do in performing their part of the work of establishing a constitutional amendment. The jurisdiction is conferred by providing that " any amendment to this constitution may be proposed in the senate or house," etc., " and if the same shall be agreed to by a majority . . . . such proposed amendment or amendments shall be entered on their journals," etc. It is not a law, an order, a bill or a resolution, that may thus be proposed and must be enrolled, but distinctively and exclusively " an amendment to the constitution" that must be so introduced and dealt with. Now "an amendment to the constitution " is specially named as the subject of the power to be exercised by the two houses in this connection, and the form of their action is to be " an agreement " and not an enactment, as it is also provided that, " if the same shall be agreed to by a majority of the members elected to each house, such proposed amendment or amendments shall be entered on their journals," etc. Thus it is seen that throughout the article, the separate and distinctive character of this particular exercise of the power of the two houses is preserved, and is excluded from association with the orders, resolutions and votes, which constitute the ordinary legislation of the legislative body. But the great and overshadowing distinction, between this and the ordinary legislation, lies in the fact that the organism which decides questions of constitutional amendment, is an entirely different and distinct organism from that which decides questions of legislation even in its broadest sense. The two houses and the governor constitute the entirety of the body which considers and finally determines all matters of legislation. But it is the two houses and the great mass of the electors of the commonwealth combined, which constitute the body which considers and determines questions of constitutional amendment. With all matters of legislation the people in their capacity of electors have nothing to do. But with constitutional amendments they have every thing to do, for the ultimate fate of all proposed amendments depends absolutely upon their approval. If they approve, the proposed amendment at once becomes a part of the constitution; if they disapprove, it fails

utterly and never comes into existence. The fundamental distinction which thus becomes most manifest, between the mere legislative machinery of the government, and that machinery which alone possesses the power to ordain amendments to the constitution of the commonwealth is most radical and extreme. Hence it follows by an inevitable conclusion that when the 26th section of the 3d article of the constitution says that " every order, resolution or vote " of the two houses shall be submitted to the governor for his approval or disapproval, it does not and cannot have, any reference to the action which the two houses take in performing their part of the work of creating amendments. After them comes the governor in matters of legislation, but after them come the electors of the commonwealth in matters of constitutional amendment. In the latter the power and will of the people are final and conclusive, in the former the power and the will of the governor are supplemental only. His action may be final, or it may not, depending on an ultimate vote of the two houses by a two-thirds, instead of a majority vote. If it is two thirds he is not an element even in matters of legislation, but he is never an element in matters of constitutional amendment. Before passing to the question of authority, only one more thought needs expression. It is (3) that these two articles of the constitution are not inconsistent with each other, and both may stand and be fully executed without any conflict. One relates to legislation only, and the other relates to the establishment of constitutional amendments. Each one contains all the essentials for its complete enforcement without impinging at all upon any function of the other. And it follows further that because each of these articles is of equal dignity and obligatory force with the other, neither can be used to change, alter or overturn the other. It is not a tenable proposition, therefore, that because the 26th section of the 3d article requires that all orders, resolutions and votes of the two houses shall be submitted to the governor, the same provision shall be thrust into the 18th article, where it is not found and does not belong.

It remains only to consider the question of authority, which while it is not, and would not be considered, as controlling in the interpretation of our own constitution, if it were adverse, is a matter of satisfaction, if it is concurring. Perhaps the

most noted instance of direct expression upon this general subject is to be found in the case of Hollingsworth v. Virginia, 3 Dallas, 378. The question arose whether the eleventh amendment to the constitution of the United States, which prohibited actions in the federal courts by citizens against states did not destroy the jurisdiction of such courts in cases pending at the time of its adoption. It was argued that the amendment had not been proposed in the form prescribed by the constitution and it was therefore void. It appeared upon inspection that the amendment was never submitted to the president for his approbation. It was further said in argument that, "The constitution declares that every order, resolution or vote, to which the concurrence of the senate and house of representatives may be necessary (except on a question of adjournment) shall be presented to the president of the United States; and before the same shall take effect, shall be approved by him, or being disapproved by him, shall be passed by two thirds of the senate and house of representatives. The attorney general being about to reply to this argument, Mr. Justice Chase interrupted him, saying, "There can surely be no necessity to answer that argument. The negative of the president applies only to the ordinary cases of legislation; he has nothing to do with the proposition or adoption of amendments to the constitution." On the next day the court (Supreme Court of the United States) delivered a unanimous opinion that the amendment had been constitutionally adopted, and that there could be no jurisdiction in any case past or future, in which a state was sued by the citizens of another state. This was in entire accord with the statement made by Chase, J., on the argument. It will be observed that the provision of article 1, section 7 of the constitution of the United States directing the submission to the president of every order, resolution or vote for his action, is in almost identical language with section 26 of article 3 of our constitution. It is said in Jamison on Constitutional Conventions, p. 588, sec. 551, that the federal amendments of 1789, 1794, 1803 and 1867 were submitted to the states without any previous submission to the president. In the case of State ex rel. Morris v. Mason, 43 La. Ann. 590, the question was distinctly presented, under a constitutional provision respecting the submission of orders, resolutions and votes to the governor

for his action, exactly similar to ours and in almost identical words, and after a most elaborate discussion of the whole subject, the court summed up its conclusions as follows, on page 649 : "Our conclusion is that the signature of the governor to the proposition for the amendment of the constitution under discussion, is not required by the constitution, and that his disapproval of it did not affect its validity." The requirements of their constitution in providing for propositions for amendments are very similar to those of our own constitution. They are, first, a reading in each house on the three separate days; second, the yeas and nays thereon; third, the entry or spreading on the journal; fourth, publication by the secretary of state; fifth, a majority vote of the electors; sixth, the proclamation of the governor. It is quite apparent that this decision must be regarded as one directly in point upon the question now before us.

A similar ruling was made, though in somewhat different circumstances, in the case of In re Senate File No. 31, 25 Neb. 864. The case of Hollingsworth v. Virginia, supra, was recognized as of binding force, the court saying of it in the opinion, "The amendment was sustained by the court, and that decision has been followed in making all the amendments to the constitution of the United States from that time to the present. See also Green v. Weller, 32 Miss. 650, and Koehler v. Hill, 60 Iowa, 543." On page 877 the court says, " It will be conceded that under our constitution it is unnecessary to submit a proposition to amend the constitution, only passed by each branch of the legislature, to the governor for his approval, as such proposition is not ordinary legislation."

In the case of Hatch v. Stoneman, 66 Cal. 632, cited for appellee, the constitutional provision directing the manner in which amendments shall be proposed and submitted to the people is quite different from the provision in our article 18 on that subject, and it was there held that the signature of the governor was essential. On page 834 the court said : " The proposal of the amendment or amendments is not by the legislature as such, in the ordinary enactment of a law, and with the proposal the governor has nothing to do. The act is that of two thirds of each branch of the legislature. But the matter of submitting the proposed amendment or amendments to the vote of the

people is quite different. That is to be done by the legislature by a law to that effect, and in the enactment of a law the governor is a part of the lawmaking power." For this reason, and because as a part of the constitutional provision, it was the duty of the legislature to submit the proposed amendment to the people " in such manner and at such time and after such publication as may be deemed expedient" it was held that this duty could only be performed by means of a law and it therefore required the governor's signature. It is only necessary to add that we have not been referred, by counsel for the appellee, to any case, in which a court of last resort has decided that a submission to the governor was required under a constitutional article similar to ours, authorizing amendments. Nor have we been able to find such a case. The only authorities that have been found are to the contrary effect. It seems clear, therefore, that upon authority the contention of the appellant is sustained, and the governor is without right to intervene in the proceedings for the creation of the amendments. We have endeavored to show heretofore, and we are of opinion and so decide, that upon the proper construction of our article 18 of the constitution, he has not authority to approve or to disapprove of the proposed amendments, and, therefore, that his action in withholding his approval was altogether nugatory.

Two other questions arose upon the hearing in the court below and they are brought before us by the appeal. The first of them is, that as no appropriation was made of moneys from the public treasury to defray the cost of publication in the newspapers, the secretary of the commonwealth could not lawfully make the publication. We do not consider that this question is of any serious force, because, in the first place, it does not appear, and is not averred, that any newspapers have refused to make the publication without being paid or secured for the cost, or even that any of them have been asked to make the publication. The secretary is not therefore able to say that he cannot make the publication for the reason stated, and hence such inability cannot be set up as a bar to the enforcement of the act proposing the amendments. It was at least his duty to try to make the publication before he could be heard to say that it could not be done. But, in the next place, the

mandate of the constitution is upon him and he must obey it in terms. If it is utterly impossible for him to obey it literally, he can make that clear to the court, stating the reasons, and then it would be for the court to determine in a proper proceeding whether the publication can be made or not. In the third place, it is not to be assumed that the state will not pay, or cannot be made to pay, by judicial decree, the necessary cost of carrying out a peremptory order which has been officially promulgated by the state legislature, in strict conformity with the requirements of the state constitution. Indeed it is not possible to conceive that the state legislature would be so derelict to its manifest duty, as to refuse to make the necessary appropriation to pay for the execution of its own order. Or even if it did so refuse, can it be seriously doubted that a way would be found by means of a judicial proceeding, to enforce the clear monetary liability of the commonwealth to defray the necessary expense in question?

The other proposition upon which reliance is placed by the appellee is, that the secretary cannot be compelled to do a vain thing, to wit: publish for three months prior to an election which was to take place in November, 1899, the amendments in question. There are two replies to this, the first of which is, that it is by no means certain that the publication must necessarily be made three months before. that general election which followed next after the amendments were agreed to by the two houses. The very next succeeding clause of article 18 is in these words, " And if in the general assembly next afterwards chosen, such proposed amendment or amendments shall be agreed to by a majority of the members elected to each house, the secretary of the commonwealth shall cause the same again to be published in the manner aforesaid," etc. Now the next general election at which " the general assembly next afterwards chosen," is, or can be, elected, does not occur till the month of November in the year 1900, as there was no such election held in 1899. It is manifest, therefore, that the next general election after the amendments were agreed to by the two houses, was of no importance, so far as the publication was concerned, and that the next general assembly that had any authority to act in the matter is the one which is to be elected in November, 1900. So far as that general assembly is concerned,

there is abundance of time in which to make the publication, and any order now made for such publication will not be a vain order by any means. The second reply to the contention of the appellee is, that where a thing is to be done, on or before a certain date, if a literal compliance as to the date becomes impossible without fault of the power which created the duty, the thing may be done, or the act performed, as soon as it becomes possible to be done after the time fixed has passed. Thus in the execution of criminals guilty of a capital offense, and sentenced or ordered to be executed on or before a fixed date, the sentence or order may be executed after the day fixed has passed. This was decided by this court in an exhaustive opinion by our Brother MITCHELL in the case of Com. v. Hill, 185 Pa. 385. We there held that the time of execution in a capital case is no part of the judgment but a mere ministerial or executive act in pursuance of it, and the judgment is, therefore, not affected by the prisoner's escape, or other occurrence which merely prevents or delays execution. The judgment is not satisfied until the sentence is fully carried out. It is also very familiar doctrine in the law of contracts that where money is to be paid, or other acts done, on or before a fixed date, if performance on or before the day named is prevented, subsequent performance will satisfy the demand of the contract, unless indeed in the exceptional instances in which time is of the very essence of the contract. So we apprehend in matters of legislation where a performance of an authorized act has become impossible through no fault of the law, a later performance, if it satisfy the terms of the original duty, will be a sufficient compliance. We think that the provision as to the publication three months before the next general election, as prescribed in the first clause of article 18, should be regarded as merely a directory provision, where strict compliance with a time limit is not essential. There are very numerous decisions upon this subject, a few of which only need be cited. They are fully collected in Endlich on the Interpretation of Statutes, at section 436. The author says, "On the other hand the prescriptions of a statute often relate to the performance of a public duty, and to affect with invalidity acts done in neglect of them would work serious general inconvenience or injustice to persons having no control over those intrusted with the duty, without promoting the es-

sential aims of the legislature. In such case they are said not to be of the essence or substance of the thing required, and depending upon this quality of not being of the essence or substance of the thing required, compliance being rather a matter of convenience, and the direction being given with a view simply to proper, orderly and prompt conduct of business, they seem to be generally understood, as mere instructions for the guidance of those on whom the duty is imposed or, in other words, as directory only. . . . It has often been held for instance, when an act ordered a thing to be done by a public body, or public officers, and pointed out the specific time when it was to be done, that the act was directory only, and might be complied with after the prescribed time. Such is, indeed, the general rule, unless the time specified is of the essence of the thing, or the statute shows it was intended as a limitation of power, authority or right. Thus the 13 Hen. 4, c. 7, which required justices to try rioters, 'within a month after the riot,' was held not to limit the authority of the justices to that space of time. . . . So a direction to sell land for taxes at a certain time, there being nothing in the act from which to imply a prohibition against doing it at a later date ; a provision in a statute that the secretary of state should cause it to be published for three months. . . . And so, as to the time limited, was the requirement of a statute directing the secretary of state to advertise for sealed proposals for the state printing, which provided that the proposals be deposited in his office 'on or before' a certain date. . . . In a word where a statute fixes a time within which public officers are to perform some act touching the rights of others, and there is no substantial reason apparent from the statute itself . . . . why the act might not be as well done after the expiration of the period limited, as during the same, . . . . the latter will, as regards third persons, be treated as directory, and the fixing of it will not invalidate or prevent official acts, under the statute, after the expiration of the prescribed period." In section 437, the author continues thus, "In general, statutes directing the mode of proceeding by public officers, are deemed advisory, and strict compliance with their detailed provisions is not indispensable to the validity of the proceedings themselves, unless a contrary intention can be clearly gathered from the statute construed in the light of other

rules for interpretation." In further illustration of the general doctrine the author at section 441, speaks of the cases in which there are impossibilities in the way of a literal performance of the statutory conditions, thus, "Enactments which impose duties on conditions are, when these are not conditions precedent to the exercise of a jurisdiction, subject to the maxim that lex non cogit ad impossibilia aut inutilia. They are understood as dispensing with the performance of what is prescribed, when performance is impossible ; for the law, in its most positive and peremptory injunctions, is understood to disclaim, as it does in its general aphorisms, all intention of compelling impossibilities, and this general exception is a general rule of statutory construction." In support of these text quotations, the author makes the most extensive citations of authorities, which it is not necessary to review in detail as there can be no real controversy over them. It will be seen at once how extremely apposite they are to the situation in the case at bar. The legislature that is to act upon the proposed amendments is not the one which was in existence when the amendments were proposed and " agreed to." There was no election in 1899 for members of the legislature, and the first election of members of the next succeeding legislature is the one which will take place in November, 1900, as has been already explained. That is the legislature which is to take the next action upon these proposed amendments, and a publication of the amendments, three months before the election of 1899, could serve no possible purpose that cannot be equally well served by a publication for three months before the general election of the year 1900. We are very clearly of opinion, therefore, that such an order may now be made without the least material violation of the terms of the law proposing the amendments. We are of opinion that the learned court below was in error in refusing the mandamus prayed for.

The decree of the court below is reversed, and the petition and proceedings for the writ of mandamus are reinstated, the petition is considered as amended praying for publication three months before November election of the year 1900, and the record is remitted to the court below with instructions that an order be issued directing the secretary of the commonwealth to publish the proposed amendments three months before the general election to be held in November in the year 1900, the costs to be paid by the commonwealth.