D. B. COLLIER v. R. A. GRAY, as Secretary of State.

157 So. 40.
En Banc.
Opinion Filed October 13, 1934.
Petition for Rehearing Denied October 24, 1934.

S. B. Knowles, John B. Singeltary, Stephens & Purvis, John F. Burket, Harrison E. Barringer, Latimer C. Farr, W. W. Whitehurst, Leitner & Leitner, L. O. Casey, Curtis Byrd, Elbert B. Griffis, C. E. Farrington, E. C. Johnson, Strauss L. Lloyd, Evans Crary, James T. Vocelle, G. R. Nottingham, H. J. Dame, Fairfax T. Haskins, M. R. McDonald, Playford A. Naylor and Thomas Sale, for Appellant;

Cary D. Landis, Attorney General, and Robert J. Pleus, Assistant, for Appellee.

ELLIS, J.—This is an application for a temporary restraining order pending an appeal from an order made by Honorable J. B. Johnson, Judge of the Circuit Court for Leon County, denying an application by D. B. Collier, a citizen of Manatee County, Florida, for an injunction to restrain Honorable R. A. Gray, as Secretary of State, from continuing to advertise in newspapers in various counties in the State a proposed constitutional amendment, said to have been submitted at the last general session of the Legislature, and from expending any public funds upon the preparation, mailing or certifying the supposed proposition to the Boards of County Commissioners of the State of Florida for the purpose of having the same printed upon the official ballots to be used at the November election.

From the order denying the injunction, which does not appear to have been recorded except by the notice of the entry of the appeal, D. B. Collier appealed to this Court. The appeal was taken on September 29, 1934, the same day that the order denying the injunction was made.

This Court is by the present application petitioned to exercise the power of granting to the complainant an injunction to restrain the Secretary of State from performing the very same public service which the Circuit Court refused to restrain him from performing.

The application is signed by twenty-two attorneys at law as solicitors for appellant.

The Court is requested to exercise the power under Section 5 of Article V of the Constitution which authorizes it to issue "all writs necessary or proper to the complete exercise of its jurisdiction."

This short cut to an expeditious determination of Mr. Collier's appeal is an anomalous proceeding and seems hardly to be justified by the exigencies of the situation. It is true that the appeal may not be determined in due course before the election, as to the notices they have doubtless already been published, so the expense to be saved which justifies the taxpayer in seeking an injunction is the cost of printing the proposition on the ballots and the supposed confusion which a wrongful submission of the proposed amendment to a vote of the electors would entail. See Crawford v. Gilchrist, 64 Fla. 41, 59 South. Rep. 963.

In that case an application for a supersedeas was denied. A temporary injunction was granted against the Secretary of State, who on appeal applied for a supersedeas. The Court, considering that the public was vitally interested, decided to hear and determine the case on its merits, questions of law only being involved.

In this case the injunction was denied, so this Court is urged to issue the necessary writ in order that it may completely exercise its jurisdiction. If this argument is considered at all it follows that we will be required to consider the case on its merits as it is obviously too narrow a ground to consider only the fact that the election will be held and

all the money spent for ballots before the record in the appeal can, in due course reach this Court and the cause be submitted on briefs.

The solicitors for appellant and the Attorney General have in view of the public interest requested the Court to dispose of the cause on the merits upon the application for a *pendente lite* injunction under Section 5 of Art. V. Const.

The proposed amendment to the Constitution, as the same has been advertised and will be printed on the ballots unless this Court grants the injunction sought, reads as follows as the same appears in the transcript of the record:

"BE IT RESOLVED BY THE LEGISLATURE OF THE STATE OF FLORIDA:

"That the following amendment to Article V of the Constitution of this State relating to the Judiciary by adding thereto additional Section 45 as hereinafter set forth, be and the same is hereby agreed to and shall be submitted to the qualified voters of the State of Florida, for ratification or rejection at the next ensuing general election, that is to say, that an addtional section to be designated as Section 45 of Article V of the Constitution of Florida be adopted to read as follows, to-wit:

"Section 45.

"(a) There shall be no more than fifteen judicial circuits of the State of Florida to be appropriately designated, numbered and defined by a suitable law enacted by the Legislature for that purpose in accordance with the amendment; provided that no judicial circuit as defined by law hereunder shall embrace less than fifty thousand inhabitants according to the last preceding State or Federal Census; and provided further that no judicial circuit existing at the time of the ratification of this amendment shall be affected, altered or abolished, except in the manner provided in this amendment for carrying the same into execution, nor shall

any existing Circuit Judge or State Attorney be disturbed in the tenure of his office until the expiration of any commission held by him on the date this amendment is ratified.

"(b) It shall be the duty of the Legislature at its next regular session after the amendment shall have been ratified to pass suitable laws to carry this amendment into effect, and to make effective the reapportionment and reduction of judicial circuits and Circuit Judges hereby contemplated.

"(c) There shall be one Circuit Judge to each Judicial Circuit, but additional Circuit Judges for Judicial Circuits may be provided for by law as authorized by Section 43 of the amended Article V of this Constitution, but the total number of Circuit Judges apportioned to any one judicial circuit shall not exceed one Circuit Judge for every fifty thousand inhabitants, or major fraction thereof after this amendment shall have been put into effect.

"(d) In Circuits having more than one Judge the Legislature may designate the place of residence of any such additional Judge or Judges.

"(e) The reapportionment of Circuits and Judges thereof hereby provided for shall become effective sixty days after the Act providing for same shall have become a law."

That resolution originated in the Senate and was known as "Senate Joint Resolution No. 582."

It appears to have passed that body by the requisite three-fifths vote required by the Constitution on May 19, 1933.

After the resolution was proposed in the Senate it was amended, so the Senate Journal discloses, by adding as Sub-Section "d" the following:

"In Circuits having more than one Judge, the Legislature may designate the place of residence of any such additional Judge or Judges."

The resolution was agreed to as amended, the vote being thirty-seven yeas. No vote was cast in the negative.

The resolution was duly transmitted to the House on the following day and was entered in full upon the Journal of that House. It had been previously entered in full in the Senate Journal without Sub-Section "d" above quoted. That entry appears on the Journal of May 11, 1933. When it came on for consideration on May 19th it was again entered on the Journal, when Senator MacWilliams proposed the amendment to be known as "Sub-Section d" above quoted. The Journal discloses that the amendment was agreed to. The Senate Journal entry is as follows:

"Senator MacWilliams offered the following amendment to Senate Joint Resolution No. 582:

"In typewritten bill add as Sub-Section 'd' the following: 'In Circuits having more than one Judge, the Legislature may designate the place of residence of any such additional Judge or Judges.'

"Senator MacWilliams moved the adoption of the amendment.

"Which was agreed to.

"And the amendment was adopted."

Other proposed amendments were rejected. The Journal entry then continues as follows:

"Senator MacWilliams moved that the rules be further waived and Senate Joint Resolution No. 582, as amended, be read a third time in full and put upon its passage.

"Which was agreed to by a two-thirds vote.

"And Senate Joint Resolution No. 582, as amended, was read a third time in full.

"Upon the passage of the Joint Resolution, as amended, the roll was called and the vote was:"

The names of the Senators voting for the Resolution as amended are omitted from this statement of the proceedings. The Journal recites that Senate Joint Resolution as amended

passed by the required constitutional three-fifths vote of all members elected to the Senate for the 1933 Session of the Florida Legislature and that the resolution as amended was ordered referred to the Committee on Engrossed Bills. The "Sub-Section 'd,'" constituting the amendment to the Resolution, was again entered on the Journal in the report of the Committee on Engrossed Bills and Senate Joint Resolution No. 582 contained in that report was ordered certified to the House of Representatives.

The Senate Joint Resolution with the amendment "Sub-Section 'd'" as offered by Senator MacWilliams and adopted by the Senate as "Senate Joint Resolution No. 582" was entered in full on the House Journal of May 22, 1933.

Now Section 1 of Article XVII of the Constitution provides that either branch of the Legislature at a regular session thereof may propose amendments to the Constitution and "if the same be agreed to by three-fifths of all the members elected to each House, such proposed amendments shall be entered upon their respective Journals with the yeas and nays."

That requirement was literally observed by the Senate, the yea and nay vote appearing on the Journal on the same day that the Resolution was entered.

The point in this case arises, so it is contended, out of the confusion arising from the entries in the House Journal.

The House Journal shows that when the Resolution was received from the Senate, containing "Sub-Section (d)" as the same was adopted by the Senate and entitled "Senate Joint Resolution No. 582," it was entered in full on the Journal of the House, read the first time by its title and referred to the Committee on Constitutional Amendments. See House Journal 1933, p. 666.

From then on the alleged confusion and departure from constitutional requirements occurs which it is contended

renders the action of the members of the Legislature nugatory and of no effect insofar as the particular proposed constitutional amendment is involved.

The House Journal of June 1, 1933, discloses that under the title of Consideration of Special Order Calendar a Resolution entitled "Senate Joint Resolution No. 582" was entered on the Journal. That resolution so entered on that date was not "Senate Joint Resolution No. 582," as the same was transmitted from the Senate on May 20th and spread on the House Journal of May 22, 1933, in that it omitted the "Sub-Section d" as it was amended on motion of Senator MacWilliams.

The resolution as it was entered on the House Journal of May 22, 1933, was exactly as it was transmitted from the Senate and passed by that body.

The resolution as it appears on the House Journal of June 1, 1933, omits as stated the amendment offered in the Senate by Senator MacWilliams and adopted by the Senate. The resolution as entered on the House Journal of June 1, 1933, contained as Sub-Section (d) Sub-Section (e), as appears in the Senate Joint Resolution, and omits as stated the MacWilliams amendment.

The House Journal of June 1st discloses that Mr. Robineau moved to "strike out everything after the resolving clause and insert in lieu thereof" a resolution which he offered. That motion was agreed to by a three-fifths vote. Thereupon Mr. Robineau moved to "Strike out everything to resolving clause and insert in lieu thereof the following: 'A Joint Resolution proposing an amendment to Article V of the Constitution of the State of Florida relating to the Judiciary by adding thereto an additional Section to be known as "Section 46 of Article V"; providing for the establishment of Judicial Circuits of this State, providing for the appointment of the Judges and State Attorneys there-

for, and providing for the creation of an Intermediate Appellate Court, composed of Circuit Judges, to be called The Court of Appeals, and fixing the jurisdiction of such of the Courts hereby provided for' ";

The motion to adopt that amendment was agreed to by a three-fifths vote. Mr. Worth then offered another amendment as follows:

"In Section 46-A, at the end of line 22 thereof, insert the following: intermediate or final."

That amendment was adopted by a three-fifths vote. So the House, in lieu of the resolution which was entered on the Journal as of June 1st, 1933, as "Senate Joint Resolution No. 582," adopted a different proposition from that which was spread on the Journal of June 1, 1933, entitled as there entered, "Senate Joint Resolution No. 582." The House Resolution was ordered referred to the Committee on Engrossed Bills. The Committee reported.

The House Journal of June 2, 1933, discloses that the Senate refused to concur in the House Amendment to "Senate Joint Resolution No. 582."

On that date there is again entered on the House Journal the same resolution as was entered on that Journal of June 1st as "Senate Joint Resolution No. 582," but which was not that resolution as adopted by the Senate. There is then entered on the Journal the amendments to which the House had agreed.

Thereupon the House agreed not to recede from its amendments.

The House then agreed to the appointment of a Committee of Three to confer with a like Committee of the Senate to adjust the differences existing between the two bodies as to the amendment to Senate Joint Resolution No. 582.

Thereupon on June 2, 1933, the House received a message from the Senate informing the House that it had appointed

a Committee of Conference on Senate Joint Resolution No. 582. There was then entered on the Journal of the House a resolution in the same words as theretofore entered on the same day as Senate Joint Resolution No. 582, but which was not the same resolution as that adopted by the Senate and transmitted to the House and spread upon the Journal of the House on May 22, 1933. On the 2nd day of June the Senate by message advised the House that the Senate had changed the personnel of its Conference Committee on the Senate's part on Senate Joint Resolution No. 582. Thereupon there was again entered on the Journal the inaccurately copied resolution. Then on the same date the House Journal discloses that the Senate advised the House by message that the Senate had adopted the Joint Conference report on Senate Joint Resolution No. 582. The inaccurately copied resolution was again entered upon the House Journal. The Journal then contains an entry to the effect that the Conference Committee had agreed that the House of Representatives do recede from its amendment.

Then follows an entry upon the Journal of the proposed House amendment which had been adopted on motion of Mr. Robineau. Then the House Journal of June 2, 1933, contains for a second time the report of the Joint Conference Committee on Senate Joint Resolution No. 582 recommending that the House of Representatives do recede from its amendment. Then follows again the proposed House amendment as offered by Mr. Robineau and adopted by the House.

On motion of Mr. Scofield the report of the Joint Conference Committee on the Senate Joint Resolution was agreed to by a three-fifths vote.

It was then stated that the "question recurred on further consideration of Senate Joint Resolution No. 582 as origi-

nally introduced." The Journal states that the Resolution was read in full.

The Journal then contains the entry of the inaccurately copied resolution, omitting the MacWilliams amendment to the resolution as it was adopted by the Senate and transmitted to the House and by it entered upon its Journal. The Journal then contained the folowing entry: "The question recurred on the final adoption of Senate Joint Resolution No. 582 as originally introduced." The roll call was made' and the yea and nay vote shown. There were ninety-three yeas and no nays and the Journal recited that "Senate Joint Resolution No. 582 was adopted, title as stated, by the constitutional three-fifths vote of all members elected to the House of Representatives for the 1933 session, Florida Legislature."

The same was ordered certified to the Senate.

On the same date, June 2nd, the House Journal shows that the Committee on Enrolled Bills to whom was referred Senate Joint Resolution No. 582 had examined the same and found it correctly enrolled, and presented the same for the signatures of the Speaker and Chief Clerk of the House. Later on the same day the Committee reported that the Resolution had been presented to the Governor for his approval.

Proposed amendments to the Constitution are required to be agreed to by three-fifths of all the members elected to each House. When that is accomplished the proposed amendment is said to be submitted. When adopted by either House it becomes the proposal of that House to amend the Constitution and when adopted by the requisite vote of each House it becomes the proposition of three-fifths of all the members or more of each House. Such proposals are not the exercise of an ordinary legislative function nor are they subject to the constitutional provisions regulating the intro-

duction and passage of ordinary legislative enactments, although they may be proposed in the form of an ordinary legislative bill or in the form of a Joint Resolution. A proposal to amend the Constitution may have a title, although it is not necessary. Whenever a title is used it is for identification, verification and convenience and may be considered an interpretation of the amendment. It may be referred to merely by its title and number and a requirement applicable to ordinary legislation that the section as amended shall be set forth at full length does not apply. The constitutional requirements that bills shall be read on different days or at different times does not apply. See 12 C. J. 693; Hollingsworth v. Virginia, 3 Dallas 378, 1 L. Ed. 644; Oakland Paving Co. v. Hilton, 69 Cal. 479, 11 Pac. Rep. 3; Cooney v. Foote, 142 Ga. 647, 83 S. E. Rep. 537; Ann. Cas. 1916 B, 1001; Warfield v. Vandiver, 101 Md. 78, 60 Atl. Rep. 538, 4 Ann. Cas. 692; Green v. Weller, 32 Miss. 650; Commonwealth v. Griest, 196 Pa. St. 396, 46 Atl. Rep. 505, 50 L. R. A. 568; McCall v. Wilkins, 145 Ga. 342, 89 S. E. Rep. 219; Hays v. Hays, 5 Idaho 154, 47 Pac. 732; Townsend v. Smith, 144 Ga. 792, 87 S. E. Rep. 1039.

Rules of proceedings for acting on proposed amendments may be adopted by each house of the Legislature insofar as not in conflict with the Constitution. Crawford v. Gilchrist, *supra*.

It is not necessary for the Governor to concur in a proposed amendment to the Constitution. See 6 R. C. L 29; Hatch v. Stoneman, 66 Cal. 632, 6 Pac. Rep. 734; People, *ex rel.* Stewart v. Ramer, 62 Colo. 128, 160 Pac. Rep. 1032; Koehler v. Hill, 60 Iowa 543, 14 N. W. Rep. 738; Warfield v. Vandiver, *supra;* Carton v. Secretary of State, 151 Mich. 337, 115 N. W. Rep. 429.

While the procedure prescribed *by the Constitution* for proposals to amend the Constitution must be duly followed

and none of the requisite steps may be omitted, yet unless the courts are satisfied that the Constitution has been violated in the submission of a proposed amendment they should uphold it. People, *ex rel.* Elder v. Sours, 31 Colo. 369, 74 Pa. Rep. 167; 102 A. S. R. 34.

. The substance more than the form is to be regarded in considering whether the complete system prescribed by Article XVII of the Constitution for submitting proposals to amend the Constitution has been observed.

Constitutional provisions derive their force not from the Legislature, but from the people in whom, under our theory of government, the power is inherent, and in the exercise of such power to make changes in the Constitution there are practically no limits except those contained in the Federal Constitution when such proposals are made in the prescribed manner. Even in case some required form of procedure has been omitted by the Legislature in submitting a proposal to amend the Constitution, but the same had been advertised or the notices published and the people have approved it at an election the amendment becomes a valid part of the Constitution. See West v. State, 50 Fla. 154, 39 South. Rep. 412.

The difficulties which lie in the way of the people to amend the Constitution seem to emphasize the reasonableness of the rule that too strict a construction of the modes of procedure prescribed by legislative regulations and forms for the exercise of the power to submit a proposal to amend is not advisable or consistent with our institutions where the Constitution itself has provided a complete system for that purpose. That doctrine may in some measure counteract the extreme view of the older school of statesmen who held that the Constitution was designed to check the propensity of the legislative department to intrude upon the duties and absorb the powers of other departments. The opportu-

nity should be afforded the people, with the least amount of technical departmental obstructions consistent with the letter and spirit of the constitutional provisions on the subject, to express their desire as to a supposedly needed change in the Constitution.

With those views in mind it is consistent with the constitutional requirement that the proposed amendment be entered upon the Journal of each House to say that the entry of Senate Joint Resolution No. 582 in the Journal of the House of Representatives on May 22, 1933, page 666 of the Journal, was a complete compliance with the requirements of the Constitution.

· That resolution, as it was transmitted to the House from the Senate on Saturday, May 20, 1933, and entitled Senate Joint Resolution No. 582, was the only proposal submitted in the House of Representatives to amend the Constitution in the matter dealt with by that proposition except the resolution offered by Mr. Robineau as referred to above and adopted by the House and from which it later receded.

When the House receded from the action it took on the Robineau resolution there was no other proposition before the House on that subject but Senate Joint Resolution No. 582 as correctly enrolled on the Journal of that House on the 22nd day of May at page 666. The mere fact that several times thereafter the resolution was improperly copied in the Journal could not in the slightest degree affect the substance or verbiage of the resolution as the same had been submitted by the Senate. It is idle to contend that the carelessness of some attache of the House or Clerk whose duty it was to make correct entries in the Journal changed the proposition as submitted by the Senate in words and substance by merely incorrectly copying the Senate proposal at other places in the Journal at different times. The recording of the proposal in the Journal is required by the

Constitution to be done but once. All other efforts to correctly enter it in the Journal were a work of supererogation and an unnecessary expense and an increasing of the cost of the State for printing. The futile effort to enter the proposal at the various times mentioned showed upon its face a mere clerical misprision in copying the resolution.

Each time that it was considered it was referred to as Senate Joint Resolution No. 582, which, as pointed out above, was a sufficient reference to the proposal as it was submitted by the Senate.

The phrase "as originally introduced" twice used in the Journal of June 2, 1933, in connection with the statement that the question recurred on further consideration of Senate Joint Resolution No. 582 and the further statement that "The question recurred on the final adoption of Senate Joint Resolution No. 582" was inaccurate language in that the word "introduced," a term used in connection with the introduction of bills in the business of ordinary legislation, does not accurately describe a proposal to amend the Constitution.

The proposal is complete when voted on and adopted. No significance whatever attaches to the contents or verbal expressions which may have been used in writing or orally by the individual member or members who first submitted the proposal. When the Senate finally agreed to the proposal which then assumed the form of a Resolution and was named and numbered for identification as Senate Resolution No. 582 it became a definite proposal to amend the Constitution so far as the Senate could submit such a proposal. When it came to the House of Representatives in due course of business and was duly and correctly entered on the Journal of the House it was not an "introduction" in the House in the sense that a bill in ordinary legislative activities is introduced. It was merely a proposal to amend

the Constitution as to which the House would agree or not agree. So the term "as originally introduced" added little if anything to the identity of the proposal as the same was submitted by the Senate and was then before the House.

Section 1 of Article XVII of the Constitution dealing with amendments requires that if the proposal "be agreed to by three-fifths of all members elected to each House, such proposed amendments shall be entered upon their respective Journals with the yeas and nays," etc.

The contention that the entry on the Journal of each House of the proposal to amend must be on the same page or paragraph of the Journal in which the yea and nay vote is recorded is to insist upon a technical construction of the language of the Constitution justified by neither logic nor the advancement of the people's rights or understanding by by the members of the particular House of their own action.

All that is required is that the members of each House shall have before them the definite proposal and that they agree to it by the requisite vote to constitute a proposal to amend. The entry on the Journal of the proposal satisfies the first requirement and the entry of the yea and nay vote when the proposal is adopted satisfies the second.

The resolution which is being published by the Secretary of State is the same resolution which is designated in the Journals of each House as Senate Joint Resolution No. 582 and correctly entered upon the House Journal of May 22, 1933.

We have read with much care and deep appreciation the briefs of the learned counsel for the appellant, but we are constrained to hold in the light of the views above expressed that the authorities cited in the brief of appellant are not applicable to the facts as presented in this case.

We do not agree with the Attorney General that the many superabundant and wholly unnecessary entries in the House

Journal referring to Senate Joint Resolution No. 582 produces any ambiguity as to the action taken by the House on the Senate's proposal to amend. To say that an ambiguity exists in this case as to the action of the House would, it seems to us, attribute to a superabundant and wholly unnecessary clerical action too much of importance and influence.

In the view we have of the case it is unnecessary to refer to the "Engrossed Resolution" as evidence of the action of the two Houses.

The Constitution relating to amendments does not deal with Engrossed Resolutions. The proposal to amend when entered upon the Journal of each House and agreed to by each House by the requisite vote, becomes automatically a proposition to amend the Constitution, and we presume that the Secretary of State when he comes to publishing notices of such proposals will, even if he uses an Engrossed Resolution as evidence of what action was taken, also check it with the Journal entries.

We deem it unnecessary in this case to resort to the "Engrossed Resolution" as supplementary evidence of the action taken by each House.

In this view of the question presented we conclude that the injunctions should be denied and the decree of the Chancellor affirmed. So ordered.

Injunction denied and decree affirmed.

WHITFIELD and TERRELL and BUFORD, J. J., concur.

DAVIS, C. J., and BROWN, J., dissent.

WHITFIELD, J. (concurring).—The Constitution provides:

"All political power is inherent in the people. Government is instituted for the protection, security and benefit of the citizens, and they have the right to alter or amend the same whenever the public good may require it; but the para-

mount allegiance of every citizen is due to the Federal Government, and the people of this State have no power to dissolve its connection therewith." Sec. 2, Declaration of Rights.

"Either branch of the Legislature, at a regular session thereof, may propose amendments to this Constitution; and if the same be agreed to by three-fifths of all the members elected to each House, such proposed amendments shall be entered upon their respective Journals with the yeas and nays, and published in one newspaper in each county where a newspaper is published, for three months immediately preceding the next general election of Representatives, at which election the same shall be submitted to the electors of the State, for approval or rejection. If a majority of the electors voting upon the amendments, at such election shall adopt the amendments the same shall become a part of the Constitution. The proposed amendments shall be so submitted as to enable the electors to vote on each amendment separately." Sec. 1, Art. XVII.

Under the above organic provision when a proposed amendment to the State Constitution has been duly "agreed to by three-fifths of all the members elected to each House," and such proposed amendment has been "entered upon their respective Journals with the yeas and nays," the *due* publication and the *due* submission of such proposed amendment to the Constitution to the electorate of the State for approval or rejection, should not be enjoined unless the proposed amendment in its entirety violates some identified provision of the Federal Constitution.

It is not denied that all of the contents of the proposed amendment to the State Constitution which was contained in Senate Joint Resolution No. 582 as originally prepared in the Senate, was "agreed to by three-fifths of all the members elected to each House" and "entered upon their respec-

tive Journals with the yeas and nays"; but it is contended that the Journals of the House do not show that the following amendment to Senate Joint Resolution No. 582, duly agreed to by the Senate, viz.:

"In Circuits having more than one Judge, the Legislature may designate the place of residence of any such additional Judge or Judges,"

was also duly agreed to by a three-fifths vote of all the members elected to the House as required by the Constitution. All amendments made by the House to Senate Joint Resolution No. 582 as amended in the Senate and as transmitted to the House by the Senate, *were receded from by the House,* which left Senate Joint Resolution No. 582, including the Senate amendment thereto, just as it was duly agreed to by the Senate and as transmitted by the Senate to the House, and as entered on the House Journal on May 22, 1933. That was the proposed amendment contained in Senate Joint Resolution No. 582 which was before the House when it agreed to Senate Joint Resolution No. 582 on the last day of the legislative session June 2, 1933. The agreeing vote was taken in the House on the last day of the session, and such day's Journal had not been approved by the House; therefore asserted ambiguities apearing in that day's House Journal in reference to the proposed amendment to the Constitution which was intended to be agreed to by the members of the House in the recorded yea and nay vote shown by the Journal in connection with the proposed amendment, may not control in determining from all Journal entries on the subject, the intent of the agreeing vote of the members of the House, as to the contents of the proposed amendment. This is elucidated in the main opinion.

Under Section 2 of the Declaration of Rights and Section 1, Article XVII, of the Constitution, the electors of the State have a right to approve or reject a proposed amend-

ment to the State Constitution and the courts should not enjoin submission to the electors upon the ground that the amendment was not duly proposed, unless there is an entire failure to comply with an essential requirement of the organic section in proposing the amendment. Where such a proposed amendment fully identified by number and title, is duly, correctly and completely entered upon the Journal of the House on one day, and after all House Amendments to the proposed amendment have been duly receded from by the House, leaving before the House the same proposed amendment that had theretofore been entered upon the House Journal, and the yea and nay vote of the members of the House duly agreeing to the same proposed amendment as it was received by the House, is entered upon the Journal of the House on a subsequent day when the vote is taken in the House on the proposed amendment, which proposed amendment is fully identified on the Journal by number and title, there is not an entire failure to comply with the essential organic requirement that proposed amendment shall be entered upon the Journal with the yeas and nays.

In this case the House received from the Senate in due course "Senate Joint Resolution No. 582: A Joint Resolution proposing an amendment to Article V of the Constitution of Florida relating to the judiciary by adding thereto an additional section to be known as Section 45 providing for the reduction of the number of judicial circuits of this State and requiring the reapportionment of such circuits and the judges thereof." The joint resolution contains the same proposed amendment to the State Constitution that is now being published for submission to the electors of the State for approval or rejection.

Such proposed amendment to the Constitution of the State was correctly and completely entered upon the Journal of the House on May 22, 1933. After all the House amend-

ments to the proposal had been *receded from* by the House, the requisite number of the members of the House agreed to Senate Joint Resolution No. 582 on June 2, 1933, the yeas and nays being entered upon the House Journal of the latter date. The final entry being:

"So Senate Joint Resolution No. 582 was adopted, title as stated, by the constitutional three-fifths vote of all members elected to the House of Representatives for the 1933 session Florida Legislature. And the same was ordered certified to the Senate."

There was before the House no Senate Joint Resolution No. 582 except the one that had been entered in full upon the Journal of the House May 22, 1933.

The entry of the proposed amendment designated Senate Joint Resolution No. 582 on the Journal of the House on May 22, 1933, and the entry on the House Journal of the yea and nay vote duly agreeing to Senate Joint Resolution No. 582 on June 2, 1933, the day the agreeing vote was taken in the House, is not an entire failure to comply with the essential organic requirement that the proposed amendment shall be entered upon the Journal with the yeas and nays. The Journal entries are not misleading.

The asserted ambiguous entries on the House Journal on June 2, 1933, not approved by the House, do not negative an intent of the members of the House, as shown by the vote taken, to agree to the identical proposed amendment contained in Senate Joint Resolution No. 582 that was received from the Senate and entered upon the Journal of the House on May 22, 1933.

. In Gray v. Childs, 115 Fla. 816, 156 So. 274, the proposed amendment as published nowhere appeared upon the Journals of the Senate. Here the proposed amendment as published does appear in full on the Journals of the House as well as of the Senate. In Crawford v. Gilchrist, 64 Fla.

41, 59 So. 963, Ann. Cas. 1914 B 616, the vote in the Senate agreeing to the proposed amendment to the Constitution was duly reconsidered and the proposed amendment was not finally agreed to by the members of the Senate. In this case Senate Joint Resolution No. 582, containing the proposed amendment was agreed to by the requisite vote of the members of the House and of the Senate, and the vote was not reconsidered.

TERRELL and BUFORD, J. J., concur.

DAVIS, C. J. (dissenting).—At the 1933 session of the Legislature Senate Joint Resolution No. 582 was passed by the Senate in the following form (omitting caption):

"BE IT RESOLVED BY THE LEGISLATURE OF THE STATE OF FLORIDA:

"That the following amendment to Article V of the Constitution of this State relating to the Judiciary by adding thereto additional Section 45 as hereinafter set forth, be and the same is hereby agreed to and shall be submitted to the qualified voters of the State of Florida for ratification or rejection at the next ensuing general election, that is to say, that an additional section to be designated as Section 45 of Article V of the Constitution of Florida be adopted to read as follows, to-wit:

" 'Section 45.

" ' (a) There shall be no more than fifteen judicial circuits of the State of Florida to be appropriately designated, numbered and defined by a suitable law enacted by the Legislature for that purpose in accordance with the amendment; provided that no judicial circuit as defined by law hereunder shall embrace less than fifty thousand inhabitants according to the last preceding State or Federal Census; and provided further, that no judicial circuit existing at the time of the ratification of this amendment shall be

affected, altered, or abolished, except in the manner provided in this amendment for carrying the same into execution, nor shall any existing Circuit Judge or State Attorney be disturbed in the tenure of his office until the expiration of any commission held by him on the date this amendment is ratified.

" '(b) It shall be the duty of the Legislature at its next regular session after the amendment shall have been ratified to pass suitable laws to carry this amendment in effect, and to make effective the reapportionment and reduction of judicial circuits and Circuit Judges hereby contemplated.

" '(c) There shall be one Circuit Judge to each Judicial Circuit, but additional Circuit Judges for Judicial Circuit may be provided for by law as authorized by Section 43 of amended Article V of this Constitution, but the total number of Circuit Judges apportioned to any one judicial circuit shall not exceed one Circuit Judge for every fifty thousand inhabitants, or major fraction thereof, after this amendment shall have been put into effect.

" '(d) In Circuits having more than one Judge the Legislature may designate the place of residence of any such additional Judge or Judges.

" '(e) The reapportionment of Circuits and Judges thereof hereby provided for shall become effective sixty days after the Act providing for same shall have become a law.' "

See House Journal at page 666, 1933 Session, where message to that effect was received in the House of Representatives.

The House of Representatives disagreed to the proposal of the Senate and passed a counter proposal of its own which (omitting caption) was as follows:

"BE IT RESOLVED BY THE LEGISLATURE OF THE STATE OF FLORIDA:

"That the following Amendment to Article V of the Constitution of this State relating to the Judiciary, by adding thereto an additional Section 46 as hereinafter set forth, be and the same is hereby agreed to and shall be submitted to the qualified voters of the State of Florida for ratification or rejection at the next ensuing General Election, that is to say, that an additional Section to be designated 'Section 46 of Article V of the Constitution of Florida' be adopted, to read as follows:

"Section 46. (A) There shall be as many Judicial Circuits of the State of Florida as there are, from time to time, Congressional Districts, and the Legislature may provide a Judge in each such Circuit for each fifty thousand population therein and an additional Judge may be provided by the Legislature whenever the population of a Circuit increases to an extent of twenty-five thousand over multiples of fifty thousand. Circuit Judges shall be appointed by the Governor and confirmed by the Senate. The Judges of each Circuit shall elect one of their number to act as Presiding Judge, who shall have the duty and power to assign the various Judges to sit in the several Counties of the Circuit at such times and in such manner as to render the most prompt and efficient judicial service, having regard for the volume of litigation in the several Counties. Such Circuit Courts shall have the same jurisdiction as heretofore granted to Circuit Courts by the Constitution of the State; provided, however, that the Legislature may create an Intermediate Appellate Court to be known as 'The Court of Appeals,' consisting of the Presiding Judges of the several Circuits hereby created, and said Court of Appeals, when so created by the Legislature, shall have and exercise such original or appellate jurisdiction as may be prescribed by law. The Constitutional jurisdiction of the Supreme Court, as provided in Article V of the Constitution, shall not be

abrogated, provided, however, that the Supreme Court may, by rule of Court, confer jurisdiction in any case upon the Court of Appeals, and provide a method of obtaining review of causes heard in the Court of Appeals by the Supreme Court, Presiding Judges of Circuit Courts, acting as Justices of the Court of Appeals, shall not be relieved of their duties as Circuit Judges. The Clerk of the Supreme Court shall be Clerk of the Court of Appeals.

"(B) The Governor, by and with the consent of the Senate, may apoint a State Attorney for each fifty thousand population in the Circuit. His duties shall be prescribed by law and he shall hold office for four years; provided, however, that in counties having a population of over fifty thousand only one such State Attorney shall be appointed and the number in the Circuit accordingly reduced. A State Attorney may exercise his functions in more than one county, if so provided by law. Duties and compensation of State Attorneys shall be fixed by the Legislature. Assistant State Attorneys, when necessary, may be authorized by the Legislature and be appointed temporarily by the Governor, but their terms of office shall not extend beyond the next ensuing session of the Legislature. Where one State Attorney is provided hereunder in any one County, he shall combine the duties of State Attorney and County Solicitor, and the latter office shall be considered abolished.

"(C) Provided, however, that no Judicial Circuit existing at the time of the ratification of this amendment shall be affected, altered' or abolished, except in the manner provided by this Amendment for carrying the same into execution, nor shall any existing Circuit Judge or State Attorney be disturbed in the tenure of his office until the expiration of the Commission held by him on the date this Amendment is ratified.

"(D) It shall be the duty of the Legislature at the next regular or special session after this Amendment shall have been ratified to pass suitable laws to carry the provisions hereof into effect.

"(E) This Section of the Constitution shall prevail, all other provisions of Article V of the Constitution to the contrary notwithstanding."

This counter proposal the Senate refused to accept or agree to. (See page 885, Senate Journal.)

The result was that in accordance with accepted parliamentary practice the whole matter of the disagreeing votes of the House and Senate was referred to a Joint Conference Committee composed of members selected from each of the legislative bodies. It was the task of this Joint Conference Committee, under the terms of its appointment, to attempt to compose the difference between the two Houses of the Legislature. When this effort had been carried through to fruition, it led to an agreement on the part of the Joint Conference Committee, which was incorporated into a report made to each House, recommending simply that the House of Representatives *recede* from any attempt on its part to insist on consideration of its counter proposal. It is significant that nowhere in this report did the Joint Conference Committee recommend that the House of Representatives *concur* in the text of Senate Joint Resolution No. 582 as it had been passed by the Senate in the form in which it was reported to the House of Representatives.

A motion to recede from an action taken, when it is carried, simply withdraws the particular proposition to which it relates, from further consideration. It is entirely negative in character and carries no implication of affirmative action by reason of its being agreed to. Therefore when the House of Representatives receded from its counter proposal the effect of that action was simply to withdraw the

counter proposal, leaving the original matter still to be acted upon by the House of Representatives in such manner as it saw fit. Thus it could either agree to Senate Joint Resolution No. 582 as it had passed the Senate and been reported to the House of Representatives, or it could pass such Senate Joint Resolution in an amended form subject to ratification of the amended form by the Senate.

The Journals of both the House of Representatives and the Senate show, as I read them, that the House did exactly what it had the right to do—that is, pass Senate Joint Resolution No. 582 in an amended form, which amended form is shown spread at length on the Journal of the House of Representatives at page 1153 *and which amended form appears followed up in the precise message that was ordered by the House to be sent to the Senate to inform the Senate what the House had agreed to in the premises after it had withdrawn or receded from its counter proposal.* See Message sent from House to Senate appearing at page 955, Senate Journal.

A comparison of what the House *reported* to the Senate as its official agreement will show that it is in *the exact text* of Senate Joint Resolution No. 582 as it appears on page 1153 of the House Journal spread at length thereon together with the yeas and nays on its adoption, as required by Section 1 of Article XVII of the State Constitution. A further comparison will show that what the House took the yeas and nays on, and what it ordered certified to the Senate as its official act, and what was in fact certified to the Senate *is not* the resolution that is now being published by the Secretary of State as a proposed amendment to the Constitution to be voted on in November, 1934. It differs from it in this respect: the House voted on the resolution absent the following clause that now appears in the published resolution, namely: "(d) In Circuits having more

than one Judge the Legislature may designate the place of residence of any such additional Judge or Judges," which clause was added in the Senate before it would pass its own proposal in the first instance. See page 527, Senate Journal, where it is shown that Sub-Section "d" as just quoted was proposed as an amendment to Senate Joint Resolution No. 582 by Senator MacWilliams before it was finally passed on a yea and nay vote and agreed to by the Senate with this provision appearing in its text as spread upon the Journal of the Senate.

Now in order to bring to pass an amendment to the Constitution of this State the exact course of procedure therefor is prescribed by the Constitution. Such procedure is mandatory because when the Constitution prescribes the method by which the Constitution is to be amended, it can be done in no other constitutional way. Crawford v. Gilchrist, 64 Fla. 41, 59 Sou. Rep. 963, Ann. Cas. 1914 B 916. The only exception that has ever been recognized to this rule in Florida is to be found in the case of West v. State, 50 Fla. 154, 39 Sou. Rep. 412, where it was held that after an actual vote upon a proposed amendment, the popular voice is the paramount act. This is in effect but the recognition of the universal rule that once an amendment is actually published and submitted to a vote of the people and by them adopted without any question having been raised prior to the election as to the method by which the amendment gets before the people, the effect of a favorable vote by the people is to cure defects in the form of publication and submission. It was because of the above stated rule laid down in the West case, that Governor Albert W. Gilchrist in the case of Crawford v. Gilchrist, *supra,* obtained an injunction against the Secretary of State to prevent the latter's publication of an initiative and referendum proposal that was being published, although it had not been *regularly*

submitted, but which if it had been allowed to go to a vote unchallenged, would nevertheless have become a part of the Constitution after being ratified by the vote of the people. *Vox populi vox dei* is a maxim that has often found favor with the judges when they have been petitioned to set aside the results of elections after they have already been held absent any complaint on the part of those interested, as to the manner or form of their conduct or procedure for ascertainment of the popular will.

Now to consider the exact procedure for proposing amendments to the Constitution of Florida.

Section 1 of Article XVII reads as follows:

"Section 1. Either branch of the Legislature, at a regular session thereof, may propose amendments to this Constitution; and if the same be agreed to by three-fifths of all the members elected to each House, such proposed amendments shall be entered upon their respective Journals with the yeas and nays, and published in one newspaper in each county where a newspaper is published, for three months immediately preceding the next general election of Representatives, at which election the same shall be submitted to the electors of the State, for approval or rejection. If a majority of the electors voting upon the amendments, at such election shall adopt the amendments the same shall become a part of the Constitution. The proposed amendments shall be so submitted as to enable the electors to vote on each amendment separately."

Thus it will be seen that while either the House of Representatives or the Senate may propose an amendment to the Constitution, the right of proposal is subject to the following stated limitations: (1) The proposal must be made at a regular session, not a special session, of the Legislature; (2) it must be agreed to by three-fifths of all the members elected to each House; (3) the proposed amendment

must (shall) be entered upon the respective Journals of each House *with* the yeas and nays, and (4) published in a newspaper for three months prior to being voted on.

It is not difficult to ascertain the reason why a proposed amendment is required to be "entered" on the Journals of each House "with" the yeas and nays thereon. It is to establish definite, certain and incontrovertible evidence of what the respective Houses have "framed" as their proposal to the people and to conclusively evidence what the respective Houses have agreed upon by a three-fifths vote of the members elected to each House.

We often speak of the intent of the "framers" of the Constitution when considering the meaning of a particular provision of our organic law. Thus we recognize that the "framing" of a constitutional provision is just as important as its "proposal." What is to become "framed" as a proposal to the people to become a part of their organic law was never intended to rest upon any less certain and secure means of ascertainment than by reference to what is "entered" upon the Journals of the respective Houses of the Legislature as evidence of what they have agreed to by the constitutional three-fifths vote of each House as recorded in connection with what is "entered" on the Journals.

Now what are the Journals of the Legislature? And what is meant by the requirement of Section 1, Article XVII, of our Constitution as implied in its phrase "proposed amendments shall be entered upon their respective Journals *with* the yeas and nays," etc? Does this mean that an amendment is to be considered as "entered" on the Journals "with" the yeas and nays when the amendment in a particular form claimed to have been agreed to appears on one day's Journal, whereas the supposed yea and nay vote by which it was agreed to appears on a subsequent day's Journal? In this connection it must be remembered

that this Court has specifically defined the "Journal" of the Legislature as being the "daily" printed pamphlets which contain the record of the procedings of each House. Amos v. Moseley, 74 Fla. 555, 77 Sou. Rep. 619, L. R. A. 1918C 482.

In the case just cited this Court said:

"The question, however, which we must first determine is, what is the Journal? Is it the bound volume which purports to be a copy of all the Journals of the entire session, or is it the printed and published pamphlet which contains the record of each day's proceedings? The word *Journal* is derived from the French word *jour,* which means 'day.' The Century Dictionary defines a Journal to be a 'diary or daily record, an account of daily transactions or events'; and says that 'Journal' is a doublet of 'diurnal,' from the Latin *diurnalas.* The Journals which the Constitution requires each House of the Legislature to keep is, therefore, a daily record."

Therefore, it seems to me that when the provisions of Section 1 of Article XVII require a proposed amendment to the State Constitution to be entered upon the "Journals" *with* the yeas and nays, it means that the proposed amendment and the yeas and nays taken and recorded respecting it, must appear *on the same day's record of proceedings.* I find no authority for ignoring the word "with" as used in the constitutional phrase "shall be entered upon their respective Journals *with* the yeas and nays." An examination of every legislative Journal from 1887 to 1933 where the Legislature has attempted to pass an amendment to the Constitution will show that the Legislature itself has heretofore consistently adopted and followed this view of the provision by first spreading on the Journal the exact text of the proposed constitutional amendment and then showing

the vote on it by yeas and nays recorded in immediate connection with it.

And in this very case, a reference to page 1153 of the House Journal will show that there is spread on the Journal on that page in connection with that day's proceedings the full text of a proposed amendment that the yeas and nays also appearing on that page were intended to be entered "with" and to relate to. If the text of the proposed amendment appearing on page 1153 was not so entered at that place for a constitutional purpose in order to comply with Section 1 of Article XVII, then it must be held that the yeas and nays as they appear on that page are wholly unconnected with any proposed constitutional amendment spread at any place anywhere in the Journal, or spread at all on that particular legislative day's record. In other words, what the Constitution mandatorily requires was not "entered" on the "Journal" of the legislative day of June 2, 1933, as this Court has construed what is meant by the word "Journal" in Amos v. Moseley, *supra*. This defect alone would be fatal if the Constitution is to be enforced as to its requirements on this subject.

It has been suggested in argument that no particular *form* is prescribed for proposing a constitutional amendment and likewise that there is no constitutional *requirement* for an orderly introduction of a proposed constitutional amendment in the form of a joint resolution followed by three separate readings of such joint resolution as a proposal to amend the Constitution, such as is required of legislative bills proposed to be enacted into laws.

My answer to this suggestion is that for forty-nine years the Legislature has itself construed the Constitution otherwise by acting on proposals to amend the Constitution only when the same has been introduced into the respective Houses in the form of joint resolutions of the Florida

Legislature. Section 17 of Article III specifically refers to those legislative measures known as "joint resolutions" and provides that "the vote on final passage of every bill *or joint resolution* shall be taken by yeas and nays, to be entered on the Journal of each House," etc.

The Legislature, whether it was compelled to do so or not, deliberately adopted in this instance a "joint resolution" as the particular parliamentary vehicle for expressing its proposal to amend the Constitution in the particulars now under consideration in this case. Such proposal being in form of a "joint resolution" as well as in substance a proposed amendment to the Constitution, was required to conform to Section 17 of Article III, as well as to conform with Section 1 of Article XVII, as I see it. Nowhere in the legislative Journal does it appear anywhere or at all that the House of Representatives ever took a yea and nay vote on the final passage of the joint resolution now being published by the Secretary of State as the Legislature's official act. On the contrary, it appears affirmatively that in the House, the vote was taken on a resolution similar in terms but differing in one vital and essential provision from that sent over to the House by the Senate in the first instance, as a comparison of the records of the one voted on with the one certified to the House by the Senate will substantiate.

To illustrate what I mean by this proposition the following is quoted from the Journal of the House of Representatives of June 2, 1933, at pages 1153-1154:

"Your Conference Committee appointed to adjust the differences existing between the Senate and the House on Senate Joint Resolution Number 582 have had the same under consideration and do respectfully recommend as follows:

"That the House of Representatives do recede from its Amendment as follows," etc.

"Mr. Scofield moved that the report of the Joint Conference Committee on Senate Joint Resolution No. 582, be adopted.

"Which was agreed to by a three-fifths vote.

"Mr. Scofield moved that the House of Representatives do recede from its Amendment to Senate Joint Resolution No. 582.

"Which was agreed to by a three-fifths vote.

"The question recurred on further consideration of Senate Joint Resolution No. 582, as originally introduced. The Resolution was read in full.

"Senate Joint Resolution No. 582.

"A Joint Resolution proposing an amendment to Article V of the Constitution of Florida relating to the Judiciary by adding thereto an additional Section to be known as Section 45 providing for the reduction of the number of Judicial Circuits of this State and requiring the reapportionment of such Circuits and the Judges thereof.

"BE IT RESOLVED BY THE LEGISLATURE OF THE STATE OF FLORIDA:

"That the following amendment to Article V of the Constitution of this State relating to the Judiciary by adding thereto additional Section 45 as hereinafter set forth, be and the same is hereby agreed to and shall be submitted to the qualified voters of the State of Florida for ratification or rejection at the next ensuing general election, that is to say, that an additional Section to be designated as Section 45 of Article V of the Constitution of Florida be adopted to read as follows, to-wit:

" 'Section 45. (a) There shall be no more than fifteen judicial circuits of the State of Florida to be appropriately designated, numbered and defined by a suitable law enacted by the Legislature for that purpose in accordance with the

amendment; provided that no judicial circuit as defined by law hereunder shall embrace less than fifty thousand inhabitants according to the last preceding State or Federal census; and provided further, that no judicial circuit existing at the time of the ratification of this amendment shall be affected, altered, or abolished, except in the manner provided in this amendment for carrying the same into execution, nor shall any existing Circuit Judge or State Attorney be disturbed in the tenure of his office until the expiration of any commission held by him on the date this amendment is ratified.

" '(b) It shall be the duty of the Legislature at its next regular session after the amendment shall have been ratified to pass suitable laws to carry this amendment into effect, and to make effective the reapportionment and reduction of judicial circuits and Circuit Judges hereby contemplated.

" '(c) There shall be one Circuit Judge to each Judicial Circuit, but additional Circuit Judges for judicial circuit may be provided for by law as authorized by Section 43 of amended Article V of this Constitution, but the total number of Circuit Judges apportioned to any one judicial circuit shall not exceed one Circuit Judge for every fifty thousand inhabitants, or major fraction thereof, after this amendment shall have been put into effect.

" '(d) The reapportionment of Circuits and Judges thereof hereby provided for shall become effective sixty days after the Act providing for same shall become a law.'

"The question recurred on the final adoption of Senate Joint Resolution No. 582, as originally introduced.

"Upon call of the roll on the adoption of the Resolution the vote was:

"Yeas—Mr. Speaker; Messrs. Albury, Anderson, Andrews, Auvil, Baskin, Bass, Bell, Bishop, Bonifay, Booth, Boyd, Boynton, Brannon, Brown, Burchard, Butler (Brad-

ford), Butler (Charlotte), Butt, Byington, Byrd, Carey, Christie, Crocker, Denison, Dickey, Dickinson, Driver, Dugger, Early, Edney, Endsley, Entzminger, Ezell, Folks, Frost, Gaston, Geiger, Goff, Hancock, Harrell, Hatch, Hendry, Herrin, Holly, Hosford, Hubbell, Ives, Kanner, Kelly, Kennedy, Kilgore, Knight, Laney, Lanier, Lewis, MacWilliams, Martin, Middleton, Murphree, O'Bryan, Pearce, Price, Rawls, Register, Rehwinkel, Rivers, Roberts, Robineau, Rogers, Sandler, Sapp, Scofield, Simmons, Sims, Smith, Stewart, Stone, Strickland, Teague, Trammell, Untreiner, Victor, Waller, Wand, Ward, Westbrook, Willis, Wood, Worth, Wynn, Zim—93.

"Nays—None.

"So Senate Joint Resolution No. 582 was adopted, title as stated, by the constitutional three-fifths vote of all members elected to the House of Representatives for the 1933 session Florida Legislature.

"And the same was ordered certified to the Senate."

A cursory comparison of what the House of Representatives voted on as Senate Joint Resolution No. 582 *as above quoted from the Journal entry itself* will show that the resolution as passed by the House is materially variant from that agreed to by the Senate in the first instance and reported to the House by a message received in the House of Representatives on May 22, 1933, appearing spread on the Journal at page 666 (House Journal).

It further appears on page 955 of the Senate Journal that what the Chief Clerk of the House of Representatives *certified* to the Senate as the action of the House in the matter at hand, was identically the resolution spread on the House Journal at page 1153, not at page 666. Thus we have a clear demonstration from both House and Senate Journals that the resolution now being published by the Secretary of State is not the resolution that the House of

Representatives agreed to by a three-fifths vote, but is the resolution spread on the Journal of the House on May 22, 1933, appearing at page 666—11 days and 487 pages earlier in the bound volume.

It is not denied that the yeas and nays appearing at page 1153 of the House Journal are the only yeas and nays ever claimed to have been taken in the House of Representatives on the proposition of agreeing to Senate Joint Resolution No. 582 by a three-fifths vote. But it *is* denied that the full text of the resolution labeled "Senate Joint Resolution No. 582" in the form it appears at page 1153 where the yeas and nays are recorded, is the resolution the House voted on. Or in other words, it is contended that the yea and nay vote appearing on page 1153 of the Journal of June 2, 1933, was a yea and nay vote taken not on the resolution spread in full on the Journal at that page, but is the record of a yea and nay vote taken on the resolution labeled "Senate Joint Resolution No. 582" as it appears spread on the House Journal at page 666 on May 22, 1933.

To explain the admitted discrepancy it is contended that the whole matter should be regarded as a clerical error on the part of the House of Representatives in entering the record of what appears at page 1153. My answer to this is that it might be equally susceptible of demonstration that what appears at page 666 is a clerical error, if we are to resort to outside evidence to prove it and not confine ourselves to the showing of the Journals as the Constitution requires that we shall.

In my view the present case is controlled by our recent decision in the case of Gray v. Childs, 115 Fla. 816, 156 Sou. Rep. 274. That case, like the instant one, involved a proposed constitutional amendment purporting to have been adopted by the 1933 Legislature to abolish the office of Tax Assessor. The Journals of the House and Senate showed

that the proposed constitutional amendment as proposed and agreed to by the Senate was not in the language of the same amendment as proposed and agreed to by the House of Representatives. The court below held the proposed amendment invalid and enjoined its publication by the Secretary of State. On appeal we affirmed that decision and said:

"Section 1 of Article XVII of our Constitution provides the method by which the Constitution may be amended. It requires that a proposed amendment shall be entered upon the respective Journals of the House of Representatives and of the Senate with the yeas and nays showing a three-fifths vote in favor of such amendment by each House. The *proposed* amendment here under consideration nowhere appears upon the Journals of the Senate, and therefore it is unnecessary for us to consider any other questions presented or any authorities cited.

"The amendment of the organic law of the state or nation is not a thing to be lightly undertaken nor to be accomplished in a haphazard manner. It is a serious thing. When an amendment is adopted, it becomes a part of the fundamental law of the land, and it may mean the weal or woe of the future generations of the state wherein it becomes a part of the fundamental law. We cannot say that the strict requirements pertaining to amendments may be waived in favor of a good amendment and invoked as against a bad amendment. If the Constitution may be amended in one respect without the amendment being spread upon the Journals of one of the respective Houses of the Legislature, then it may be amended in any other respect in the same manner. It is not for the courts to determine what is a wise proposed amendment or what is an unwise one. With the wisdom of the policy the courts have nothing

to do. But is the duty of the courts, when called upon so to do, to determine whether or not the procedure attempted to be adopted is that which is required by the terms of the organic law.

"Finding that the organic law has not been complied with, as above pointed out, the decree appealed from should be, and the same is hereby, affirmed on authority of the opinion and judgment in the case of Crawford v. Gilchrist, 64 Fla. 41, 59 Sou. Rep. 963, Ann. Cas. 1914-B, 916."

In that case the proposed amendment that was being published, in the form that it was being published, did not appear to have been voted upon by the Senate. The journals were resorted to in that case to demonstrate that fact. In that case the Attorney General contended, as he does here, that the Constitution on this point is not mandatory, but this Court held otherwise and enjoined the publication.

My view is that Gray v. Childs, *supra*, controls the decision in this case and requires a reversal of the decree here appealed from. If that case is no longer to be followed in this jurisdiction, then before the present term of this Court ends, we should recall that decision and allow the people to vote on the Tax Assessor amendment as well as the Circuit Judge amendment.

It is beside the point to say that we are merely correcting a clerical error in the Journal by referring back from page 1153 to 666 of the House Journal. It is not lightly to be presumed that the House of Representatives did not intend to do what the Legislative Journal of June 2, 1933, shows it did do.

In Stockton v. Powell, 29 Fla. 1, 10 Sou. Rep. 688, 15 L. R. A. 42, this Court rendered a decision on a matter of legislative procedure similar to that here involved and held that the provision of Section 21 of Article III of the original Con-

stitution of 1885 to the effect that "Evidence that such notice (notice of intention to apply for the passage of local legislation) has been published shall be established in the Legislature before such bill shall be passed" would not be enforced by the Courts but would be left up to the Legislature entirely. The Stockton v. Powell decision, *supra,* was handed down by this Court in January, 1892, seven years after the Constitution of 1885 was adopted. And from the date of the decision of this Court in Stockton v. Powell, *supra,* in 1892 to 1929, Section 21 of Article III of the Constitution of the State requiring publication of local laws before they could be passed, was a dead letter insofar as observance by the Legislature was concerned.

Thus, as a result of the decision of this Court in Stockton, v. Powell, *supra,* for eighteen regular sessions of the Legislature and for perhaps a third of that number of special session, Section 21 of Article III of the Constitution of this state was as effectively nullified in its purpose through tolerated disregard of it in the courts, as if it had been expressly repealed. The long train of evil consequences following that unhappy decision in a case involving the process of law making is attested by the thousands of local bills that were thereafter passed without even a pretense of publication of any notice thereof as required by Section 21 of Article III. And this evil continued during the period of thirty-five years that elapsed after the doctrine of Stockton v. Powell had superseded the express language of the organic law on the subject, and grew to such an extent that the constitution was amended in 1928 in such decisive language that disobedience to the exact constitutional requirement that had always been part of the fundamental law, could no longer be judicially condoned.

My fear in this case is that we are, as a matter of ex-

pediency, simply writing another Stockton v. Powell decision on the question of the process required for framing and adopting amendments to the Constitution and are thereby making possible for the future a complete disregard of the constitutional requirement of Section 1 of Article XVII to the effect that a proposed constitutional amendment, as finally framed and agreed to by a three-fifths vote of each House of the Legislature, shall be *entered* on the Journal of each House and, in addition thereto, shall be entered *with* the yeas and nays recorded for and against the proposal as so *entered*.

There is no plausible reason for the judicial invention of excuses for misprisions in the process of lawmaking, since exact compliance with the comparatively simple procedure prescribed in the Constitution for the enactment of statutes is not difficult. There is all the more reason for holding the Legislature to a rigid compliance with the Constitution in the matter of framing and adopting amendments to our organic law, since in proposing amendments to our constitution the Legislature acts under a delegated power, not as a legislature, but as a specially provided for constitutional convention with respect to each proposal, and no matter of such vital import as an amendment to the Constitution should rest on any less definite and certain evidence than that which the Constitution in Section 1 of Article XVII ordains shall be perpetuated as evidence of what the Legislature, acting as a special constitutional convention, has elected to "frame" as a proposed constitutional amendment.

This Court has heretofore refused to follow the informality of procedure for amending the Constitution, that has been approved in the decisions cited in the majority opinion as having been delivered by the courts of California,

Georgia, Mississippi, Pennsylvania, Colorado, Iowa and Michigan. It did so in the recent tax assessor abolition amendment case of Gray v. Childs, 156 Sou. Rep. 274, decided by this Court on July 21, 1934. I see no reason for following decisions from other states which are in conflict with our own on the same subject, unless we are prepared to overrule our own decisions and set up for the future a liberality of judicial view not heretofore sanctioned by this Court.

For the reasons stated, I respectfully dissent from the opinion and holding of the Court in this case.

BROWN, J., concurs.