**[J-65A-2023, J-65B-2023 and J-65C-2023] [MO: Todd, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | |
|---|---|
| LARRY KRASNER, IN HIS OFFICIAL CAPACITY AS THE DISTRICT ATTORNEY OF PHILADELPHIA | : No. 2 EAP 2023<br>:<br>: Appeal from the Order of<br>: Commonwealth Court entered on<br>: December 30, 2022, at No. 563 MD<br>: 2022. |
| v. | :<br>: ARGUED: November 28, 2023 |
| SENATOR KIM WARD, IN HER OFFICIAL CAPACITY AS PRESIDENT PRO TEMPORE OF THE SENATE; REPRESENTATIVE TIMOTHY R. BONNER, IN HIS OFFICIAL CAPACITY AS AN IMPEACHMENT MANAGER; REPRESENTATIVE CRAIG WILLIAMS, IN HIS OFFICIAL CAPACITY AS AN IMPEACHMENT MANAGER; REPRESENTATIVE JARED SOLOMON, IN HIS OFFICIAL CAPACITY AS AN IMPEACHMENT MANAGER; AND JOHN DOES, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE SENATE IMPEACHMENT COMMITTEE | : |
| APPEAL OF: REPRESENTATIVE TIMOTHY R. BONNER AND REPRESENTATIVE CRAIG WILLIAMS | : |
| LARRY KRASNER, IN HIS OFFICIAL CAPACITY AS THE DISTRICT ATTORNEY OF PHILADELPHIA,<br><br>Appellant | : No. 3 EAP 2023<br>:<br>: Appeal from the Order of<br>: Commonwealth Court entered on<br>: December 30, 2022, at No. 563 MD<br>: 2022. |
| v. | :<br>: ARGUED: November 28, 2023 |
| SENATOR KIM WARD, IN HER OFFICIAL CAPACITY AS PRESIDENT PRO | : |

TEMPORE OF THE SENATE; : 
REPRESENTATIVE TIMOTHY R. : 
BONNER, IN HIS OFFICIAL CAPACITY AS : 
AN IMPEACHMENT MANAGER; : 
REPRESENTATIVE CRAIG WILLIAMS, IN : 
HIS OFFICIAL CAPACITY AS AN : 
IMPEACHMENT MANAGER; : 
REPRESENTATIVE JARED SOLOMON, IN : 
HIS OFFICIAL CAPACITY AS AN : 
IMPEACHMENT MANAGER; AND JOHN : 
DOES, IN THEIR OFFICIAL CAPACITIES : 
AS MEMBERS OF THE SENATE : 
IMPEACHMENT COMMITTEE, : 
: 
: 
Appellees : 
: 
LARRY KRASNER, IN HIS OFFICIAL : No. 4 EAP 2023
CAPACITY AS THE DISTRICT ATTORNEY : 
OF PHILADELPHIA : 
: Appeal from the Order of the
: Commonwealth Court entered on
: December 30, 2022, at No. 563 MD
v. : 2022.
: 
: ARGUED: November 28, 2023
: 
SENATOR KIM WARD, IN HER OFFICIAL : 
CAPACITY AS PRESIDENT PRO : 
TEMPORE OF THE SENATE; : 
REPRESENTATIVE TIMOTHY R. : 
BONNER, IN HIS OFFICIAL CAPACITY AS : 
AN IMPEACHMENT MANAGER; : 
REPRESENTATIVE CRAIG WILLIAMS, IN : 
HIS OFFICIAL CAPACITY AS AN : 
IMPEACHMENT MANAGER; : 
REPRESENTATIVE JARED SOLOMON, IN : 
HIS OFFICIAL CAPACITY AS AN : 
IMPEACHMENT MANAGER; AND JOHN : 
DOES, IN THEIR OFFICIAL CAPACITIES : 
AS MEMBERS OF THE SENATE : 
IMPEACHMENT COMMITTEE : 
: 
: 
APPEAL OF: SENATOR KIM WARD :

**CONCURRING OPINION**

**JUSTICE WECHT**                                             **DECIDED: September 26, 2024**

I join the Majority Opinion. In its scholarly and well-reasoned analysis, the Majority persuasively establishes that the text and structure of the Pennsylvania Constitution do not permit unfinished business of the General Assembly to extend beyond its adjournment *sine die* at the end of its two-year session, because the legislature is a "continuing body" for only that period of time.[1] I agree with the Majority that impeachment matters are not a special exception to that general rule.

I write separately because the Concurring and Dissenting Opinion (the "Dissent")[2] raises substantial points that merit additional discussion, particularly concerning the practical consequences of today's ruling. The Dissent articulates well the opposing perspective on this matter, and it notes a number of serious and legitimate areas of concern. Nonetheless, there are several reasons that I respectfully differ with the Dissent, and that cause my views to remain aligned with the Majority.

At the outset, it is noteworthy that there appears to be no dispute about the general application of the rule concerning adjournment *sine die*, or that it is, in fact, a rule of constitutional magnitude. Indeed, the President Pro Tempore of the Senate begins her argument to this Court with the acknowledgment that it is "axiomatic that all legislative matters pending before the preceding session of the General Assembly are terminated

---

[1]      *See* PA. CONST. art. II, § 4 ("The General Assembly shall be a continuing body during the term for which its Representatives are elected. It shall meet at twelve o'clock noon on the first Tuesday of January each year. Special sessions shall be called by the Governor on petition of a majority of the members elected to each House or may be called by the Governor whenever in his opinion the public interest requires.").

[2]      Although Justice Mundy concurs in the determination that the effect of adjournment *sine die* raises a justiciable question, she dissents from the Majority's resolution of that question. Because I address only the dissenting portion of Justice Mundy's opinion, I refer to it as the "Dissent."

[J-65A-2023, J-65B-2023 and J-65C-2023] [MO: Todd, C.J.] - 3

upon adjournment *sine die* and cannot 'carry over' from one General Assembly to the next."[3] The Dissent, as well, acknowledges that this is the general rule, and that the rule derives from Article II, Section 4 of the Pennsylvania Constitution.[4] It appears, thus, that all can agree upon the effect of adjournment *sine die* as a general matter.

The argument against applying the general rule to the matter before us is premised upon the suggestion that there is something unique about impeachment matters that exempts them from compliance with the requirements of Article II of our Constitution. This special attribute of impeachment, the argument goes, follows from the assertion that impeachment is not a "legislative" matter, and that it is better characterized as "judicial" in some sense (at least regarding the Senate's role as trier of impeachments).[5] Because impeachment is not "legislative," and because the constitutional authority for impeachment, trial, and removal from office appears in a separate Article of our Constitution, it is argued, the requirements of Article II are inapplicable.

I do not find the "legislative" versus "judicial" distinction to be particularly compelling. The Dissent stresses, for instance, that the "text of the relevant provisions of Article II clearly outlines the legislative powers of the General Assembly," emphasizing that Article II, Section 1 provides that the "legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of

---

[3] Designated Appellee Senator Kim Ward's Br. at 20 (internal quotation marks omitted).

[4] *See* Dissent at 10 (referring to the Article II, Section 4 requirement that the House and Senate pass bills "in the same legislative session").

[5] *See, e.g., Krasner v. Ward*, 563 M.D. 2022, 2023 WL 164777, at *11 (Pa. Cmwlth. Jan. 12, 2023) (*en banc*; unreported) ("The restrictions imposed by the Pennsylvania Constitution upon the General Assembly's legislative powers . . . do not apply to its judicial powers of impeachment, trial, and removal."); Dissent at 4 ("[T]he Senate in its constitutional role as the trier of an impeachment is not exercising a legislative function. . . . When conducting an impeachment trial, the Senate has a specific role, separate and distinct from its legislative functions.").

Representatives."[6]  This is surely true, of course, but it does not follow that Article II is therefore irrelevant to Article VI, or that the powers vested in the General Assembly—or the House or Senate individually—become "judicial" by virtue of their appearance in a separate Article of the Constitution.  To the contrary, our Constitution is very clear about where it vests the "judicial power of the Commonwealth":  "in a unified judicial system consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal courts in the City of Philadelphia, such other courts as may be provided by law and justices of the peace."[7]  The fact that an impeachment trial can, in some colloquial sense, be called judicial or quasi-judicial does not strike me as dispositive.  Indeed, one might just as easily suggest that impeachment is, in fact, a "legislative power"; it is a power exercised by the legislative branch of government.

To the extent that the exercise of "legislative power" is a matter solely of making *legislation*, it is noteworthy that the adjournment *sine die* rule does not appear alongside the constitutional requirements for that activity.  Rather, it appears among the rules for what constitutes the *legislature* itself.  Article II is entitled "The Legislature," and it contains not only the adjournment *sine die* rule, but also the rules specifying, *e.g.*, the term lengths of Representatives and Senators, their qualifications (and disqualifications), how many members constitute a quorum, etc.[8]  These provisions establish the framework for what constitutes the legislature in the first place—what it is, who may be a member of it, and

---

[6]      Dissent at 5 (quoting PA. CONST. art. II, § 1) (emphasis omitted).

[7]      PA. CONST. art. V, § 1; *see also Robinson Twp. v. Commonwealth*, 83 A.3d 901, 927 (Pa. 2013) ("The judicial power of the Commonwealth is not vested in the General Assembly, but in a unified judicial system, which includes the Commonwealth Court and, ultimately, this Court, which presides over our branch of government.").

[8]      *See* PA. CONST. art. II, §§ 2, 3, 5, 6, 10.

when it is empowered to act. The rules for *legislating* appear in Article III, entitled "Legislation," and they include requirements such as the single-subject rule, the original-purpose rule, the three-considerations rule, etc.[9] If the adjournment *sine die* rule only concerned the power to make ordinary legislation, and did not apply to any other activity of the House or Senate, then one would expect the rule to appear in Article III, alongside the other such rules. But it does not; it lies in Article II with the other foundation blocks of the General Assembly.

Those numerous other requirements in Article II provide an insight that substantially affects my view of this case. As far as I can tell, the adjournment *sine die* rule is the *only* rule in Article II that the opposing view would deem categorically inapplicable to impeachment matters. Would the House be empowered to impeach an official without a quorum, or could the Senate try the official without a quorum?[10] Could the Senate conduct an impeachment trial with ineligible members?[11] Could it do so outside of the terms for which its members were elected?[12] Could it do so in secret?[13] One would expect the answer to be "no" to all of the above, for a simple reason: such actions would violate the Constitution. If an official complained that he had been impeached without a quorum, for example, it is hard to imagine that such a core violation of the Constitution would be waved off because it only appears in Article II and thus concerns "legislative" power, as opposed to the purportedly "judicial" power of impeachment. And if the remainder of Article II continues to apply to impeachment

---

[9] *See* PA. CONST. art. III, §§ 1, 3, 4.

[10] *See* PA. CONST. art. II, § 10.

[11] *See* PA. CONST. art. II, §§ 5, 6, 7.

[12] *See* PA. CONST. art. II, § 3.

[13] *See* PA. CONST. art. II, § 13.

matters, then there is no reason to conclude that just *one* rule in Article II is inconsequential.

This same line of reasoning leads me to conclude that the opposing view's reliance upon *Griest*[14] is misplaced. As the Majority explains, *Griest* addressed the question of whether a proposed constitutional amendment required submission to the Governor for approval or veto, as is the case for ordinary legislation. This Court reasoned that, because the Constitution spelled out a complete process for amendment that conflicted with the ordinary requirements for legislating (by providing no role for the Governor), there was no basis for inserting into the amendment process the distinct requirements applicable to ordinary legislation under Article III.

Taken in isolation, one passage from *Griest* likely provides the opposing view with its strongest argument—that the amendment process was "a separated and independent article, standing alone and entirely unconnected with any other subject," which did not "contain any reference to any other provision of the constitution as being needed or to be used in carrying out the particular work to which the eighteenth article is devoted."[15] On the surface, this language does provide support for the view that, because impeachment proceedings are addressed in an article (Article VI) separate from the one that prescribes requirements for ordinary legislation (Article III), the latter does not control the former. But the Article II requirements are something different; again, they concern the structure of the *legislature*, not the rules for *legislating*. This is a significant difference. If the question in *Griest* concerned, for example, whether the House and Senate could propose a constitutional amendment without a quorum, or with ineligible members, I suspect that the answer would have been quite different. This is because the Article II rules—the

---

[14] *Commonwealth v. Griest*, 46 A. 505 (Pa. 1900).

[15] *Id.* at 506.

adjournment *sine die* rule included—concern the foundational operating requirements of the legislature, not the rules for making legislation.

Finally, although I differ with the Dissent's view of the merits, I believe that the Dissent identifies a legitimate practical concern with application of the adjournment *sine die* rule to impeachment matters. If the entire impeachment proceeding must take place within a single two-year legislative session, the Dissent warns, then an impeached official could attempt to "run out the clock" with delay tactics, and thus avoid trial in the Senate and the potential consequences of conviction.[16] Although this is a potential issue, there are risks of timing manipulation either way.[17]

Regardless, I believe that there is a remedy for the concern. Should the Senate fail to act upon an impeachment prior to adjournment *sine die* and the expiration of the legislative session, the new House could always pass the articles of impeachment again. This would renew the two-year period within which to conduct the impeachment trial. Indeed, if the conduct of the impeached official truly warrants such intervention on the part of the legislature, then it should not be especially difficult to provide the impeachment proceedings with the legitimacy fostered by a vote of the Representatives who represent the will of the people at the time.

---

[16] Dissent at 12.

[17] *See* Second Brief of Designated Appellant District Attorney Larry Krasner at 60 n.34 ("Respondents Bonner and Williams argue that a rule terminating articles of impeachment upon *sine die* adjournment would give impeached officials an incentive to try to 'beat[] the clock.' That argument is deeply ironic. Here, the House adopted the Amended Articles on November 16, 2022, in a lame duck session largely along partisan lines after an election in which it became clear that Republicans would lose control of the House. The House exhibited the Amended Articles to the Senate on November 30, 2022, the very last day of the session. In turn, the Senate then issued an impeachment summons hours before the expiration of the 206th General Assembly. If anyone was trying to 'beat the clock,' it was Respondents and the Republican-led expired 206th General Assembly.") (citation and emphasis omitted).

For these reasons, I respectfully differ with the views of the Dissent, and I join the Majority Opinion.